287 F.2d 231
 LOCAL UNION 984, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA,
AFL-CIO, an unincorporated labor
organization, et al., Appellants,
v.
HUMKO COMPANY, Inc. (A Division of National Dairy Products
Corporation), Appellee.
LOCAL UNION 984, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA,
AFL-CIO, an unincorporated labor
organization, et al., Appellants,
v.
Ralph Kent PHILLIPY et al., Appellee.
LOCAL UNION 984, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA,
AFL-CIO, an unincorporated labor
organization, et al., Appellants,
v.
KUHNE-SIMMONS COMPANY, Inc., An Illinois Crporation, Appellee.
 Nos. 13896-13898.
 United States Court of Appeals Sixth Circuit.
 Feb. 15, 1961.
 
 1
 Charles J. Morris and L.N.D. Wells, Jr., Dallas, Tex., for appellants.
 
 
 2
 David Previant, Milwaukee, Wis., L.N.D. Jr. and Charles J. Morris, Dallas, Tex., George Fitzgerald, Detroit, Mich., on brief, for International Brotherhood of Teamsters.
 
 
 3
 Mullinax, Wells & Morris, Dallas, Tex., Goldberg, Previant & Cooper, Milwaukee, Wis., Anthony J. Sabella, Memphis, Tenn., George Fitzgerald, Detroit, Mich., on brief, for Local Union 984, et al.
 
 
 4
 Clarence Clifton, Memphis, Tenn., John B. Mack, Marvin Posner, Memphis, Tenn., on brief, for HumKo Co.
 
 
 5
 Donald Reno, Champaign, Ill., Reno & O'Byrne, Champaign, Ill., on brief, for Kuhne-Simmons Co., Inc.
 
 
 6
 Frank J. Glankler, Jr., Memphis, Tenn., John M. Heiskell, Memphis, Tenn., on brief, for Ralph KentPhillipy et al.
 
 
 7
 Before McALLISTER, Chief Judge, POPE, Circuit Judge, and THORNTON, District Judge.
 
 
 8
 THORNTON, District Judge.
 
 
 9
 This is an appeal from three judgements entered by the District Court in three cases consolidated by the Court and tried to the Court. Plaintiff HumKo Company, Inc., hereinafter called 'HumKo' recovered a judgment in the amount of $57,013.05. Plaintiff Ralph Kent Phillipy, et al., hereinafter called 'Phillipy' recovered a judgment in the amount of $11,264.73. Plaintiff Kuhne-Simmons Company, Inc., hereinafter called 'Kuhne' recovered a judgment in the amount of $29,358.52. These judgments were recovered by each of these plaintiffs except HumKo against the same defendants, International Teamsters Local 984 of Memphis, Tennessee, and International Teamsters Union and certain agents and representatives of each, namely, R. A. Farrell as president of Local 984, and Francis J. Murtha as international or field representative of the International Union. HumKo's judgment was against International Teamsters Local 984 of Memphis, Tennessee, and International Teamsters Union. The complaints alleged violations of Section 303(a) of the Taft-Hartley Act, 29 U.S.C.A. 187, which section prohibits secondary boycotts. (See Appendix, page 1, where this section of the statute is set forth in full.) Recovery of the damages sustained and of the costs of the suits was sought. The causes of action in the three suits were the same, except for the variations in the actual damage figures.
 
 
 10
 The appellants have submitted what they consider to be the proper questions for review on this appeal. The appellees have submitted a counterstatement of what they consider to be properly before the Court on this appeal. The two sets of questions are not in accord. For the purpose of completenss in this opinion, we include the two statements above referred to in the appeandix attached hereto. We here state, however, that we believe the questions as submitted by the appellants are so phrased as to result in the invasion of the province of this Court by predetermining that the findings of the Trial Court are clearly erroneous. After an analysis of a rather extensive record, we recognize the counterstatement of questions presented by appellees as being a proper statement of the matter before us for determination.
 
 
 11
 The District Judge made detailed findings of fact which we summarize.
 
 Summary of the Findings of Fact
 
 12
 The Humko Company, Inc., a tennessee corporation, was a division of National Dairies with its plant on Thomas Street in Memphis, Tennessee, where its mormal business was the manufacturing, selling and distribution of edible fats and oils; D. R. Phillipy & Sons Company had its principal place of business at Memphis, Tennessee, and was a mechanical contracting firm; Kuhne-Simmons Company, Inc., was an Illinois corporation with its principal office located at Champaign, Illinois, and was engaged in the general construction business; Local Union 984, International Brotherhood of America was an unincorporated association organized and existing for the purpose, among other things, of representing employees in collective bargaining with their employers. It maintained its office and place of business in Memphis, Tennessee, and did business regularly within the jurisdiction of the District Court. The defendant, R. A. Farrell, was a resident of Tennessee, was president and chief executive officer of Local 984; he was sued in his representative capacity; Local 984, as a labor organization, was subject to the Labor-Management Relations Act; the defendant International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America was an international labor union organized as an unincorporated association composed of subordinate affiliated local labor unions located throughout the United States, of which Local 984 was one. The International had its headquarters and principal place of business in Washington, D.C. It conducted business regularly within the jurisdiction of the District Court below, through its member, Local 984, and through its agent or representative, Francis J. Murtha, who was a resident of Memphis, Tennnessee. Murtha was sued in his representative capacity only. The International was a labor organization subject to the Labor-Management Relations Act.
 
 
 13
 Murtha, on July 12, 1957, was an orgainzer for the International Union with his headquarters in Memphis, Tennessee, his duties covering ten southern states, including Tennessee. Such duties were general and were assigned to him by the president of the International or by someone else in authority. They were to make investigations, to assist in negotiations, to conduct elections, to manage trusteeships, to attend hearings, and to consult with officers of local unions with respect to organizing various groups of employees. Murtha transacted business on behalf of the International in the Local 984 headquarters in Memphis, Tennessee, where he had a desk, use of the telephone and of secretarial service; Local 984 was, on July 12, 1957, the certified bargaining agent for the .production, Maintenance and Drivers hourly paid employees of the Thomas Street plant of HumKo. Farrell and Kuhns, as officers of Local 984, attended and participated in collective bargaining negotiations with officials and representatives of HumKo to secure a contract for the Production, Maintenance and Drivers hourly paid employees of the Thomas Street plant of HumKo. This took place before, during and after the period of picketing at Champaign, Illinois. Murtha attended and took an active part in several of these collective bargaining meetings with the officials of HumKo and the officers of Local 984. On one occasion at least, Murtha was the only representative participating in such collective bargaining negotiations with officials of HumKo. At all times during these negotiations and during the period Murtha was so engaged, his sole and only occupations was as International organizer. He was receiving his regular salary from the International. He received no form of payment from Local 984 for his services.
 
 
 14
 On July 8, 1957, during the negotiations between Local 984 and HumKo, a picket line was placed at the Thomas Street plant of HumKo. On July 12, 1957, a labor dispute existed between HumKo and Local 984.
 
 
 15
 In the latter part of 1956, HumKo had entered into a contract with Phillipy and Kuhne, as independent contractors, for the construction of a plant to be known as the Midwest Refinery of HumKo at Champaign, Illinois, which is about 400 miles from Memphis, Tennessee. This plant, when completed, would produce edible tases and oils. On July 12, 1957, in furtherance of this contract, Phillipy and Kuhne were engaged in the construction of this plant, and no employees of HumKo did any work of any kind or nature on such construction. No employee or official of HumKo gave instructions or directions to any of the employees of Phillipy, Kuhne or to any other contractor or subcontractor engaged in this construction. On the 12th day of July, 1957, both Phillipy and Kuhne had many of their own employees working on this construction, all of whom were labor union members; Phillipy and Kuhne, as independent contractors, also had several subcontractors performing work and services on this job, and all such employees were also members of various labor union organizations. As of July 12, 1957, neither Phillipy nor Kuhne had any labor dispute with Local 984, nor with any other labor organization or union-- local or international-- and the same is true of every other contractor, subcontractor and/or employee working on the Job as of that date.
 
 
 16
 The construction site of Midwest Refinery was wholly enclosed by a wire cyclone fence, and the entrance gate to the construction site was a wire cycolone gate on Mattis Road, where all of the employees of Phillipy and Kuhne, and the other contractors and shbcontractors entered upon the construction site. On July 12, 1957, the construction of the Midwest Refinery was approximately 65-75% Completed, but neither the possession of the whole plant, nor of any part of it, had been turned over to HumKo on this date; the only employees of HumKo at the construction site were salaried, advisory and engineering employees.
 
 
 17
 There were no Production, Maintenance and Drivers hourly paid employees of HumKo at this construction site; the machinery for the manufacturing of edible fats and oils was not yet installed at the HumKo plant at Champaign; on raw materials for the manufacturing process of edible fats and oils were on the job site; and no edible fats and/or oils were being manufactured, sold or distributed at the Midwest Refinery of HumKo at Champaign.
 
 
 18
 All of these facts wer known to the agents and officers of Local 984, and to the local agent of the International.
 
 
 19
 On July 11, 1957, an officer and agent of Local 984, accompanied by several striking HumKo employees, attended a meeting of business representatives of various unions at the meeting place of the Champaign Trades and Labor Council. This officer and agent requested them and their unions to instruct their members not to cross the picket line and not to do any work for their neutral contractor employers who were in the process of constructing the HumKo plant. He also told them that they would be very poor union members if they did not respect the picket line and that, notwithstanding any advice to the contrary, he was going to set up a picket line on the following morning. On the morning of July 12, 1957, pickets from Local 984, who had been brought from Memphis, Tennessee, by an officer of Local 984, formed a picket line at the entrance gate of the Midwest Refinery of HumKo at Champaign. They carried placards bearing this legend: 'Production, Maintenance and Driver Employees of The HumKo Co., Inc., Memphis, Tennessee, On Strike for better wages & working conditions * * * Members of General Drivers, Salesmen and Warehousemen's Local Union No. 984, AFL.' These pickets maintained said picket line continuously until the late afternoon of July 23, 1957. The purpose of the picket line was to stop construction work at the Midwest Refinery of HumKo, at Champaign. On July 12, 1957, the employees of Phillipy, Kuhne and of the other contractors and subcontractors engaged in this construction work appeared for work but none of these employees crossed the picket line on this date for the purpose of working on such construction, nor did they do so on any subsequent working day, during the time that the picket line was maintained. No construction work of any kind was done from the morning of July 12, 1957, until the morning of July 24, 1957, by any of the employees of Phillipy or Kuhne, or of any other contractors or subcontractors engaged in this project. These contractor employers on the job (who were secondary neutral employers) were thereby forced to cease doing business with HumKo.
 
 
 20
 On July 15, 1957, while a picket line was being maintained at the HumKo plant at Champaign, a collective bargaining meeting was had in Memphis, Tenbessee, between Local 984 and officials of HumKo, at which it was stated, in substance, by a humKo official, that further negotiations were being made more difficult because of the maintenance of the picket line at the HumKo plant at Champaign. Francis J. Murtha, the International organizer, was present at the meeting when this statement was made, but he made no objection to, nor repudiation of such statement or fact, on behalf of the International. During the maintenance of the picket line at Champaign, Local 984 was assured by R. A. Farrell, its president (in a statement by him at a Local Union meeting) that the International was 100% Behind the Local.
 
 
 21
 On July 15, 1957, Kuhne filed with the National Labor Relations Board at Chicago a complaint charging Local 984 with setting up and maintaining a picket line at the Midwest Refinery of HumKo at Champaign. It further charged that such picket line encoruaged and induced the employees of Kuhne to engage in a strike or concerted refusal to work or perform services in the course of their employment, the object being to force Kuhne to case doing business with HumKo. On July 23, 1957, a settlement agreement of this complaint was effected by Local 984, Kuhne and the Regional Director of the National Labor Relations Board at Chicago. Thereafter Local 984 caused the picket line at the Champaign plant to be withdrawn.
 
 
 22
 There was a complete stoppage of all construction work from July 12, 1957 to July 23, 1957, at the site. Construction work was resumed on the morning of July 24, 1957, but such resumption was not normal, nor was there a normal number of employees back on the job until approximately two weeks after July 24, 1957.
 
 
 23
 The defendant International functions under a written constitution, and is comprised of an unlimited number of local unions. One of the objects of the International is to organize all workers under one banner, and to educate them to cooperate in every movement which tends to benefit the organization. All members of local unions are members of the International and the International approves or disapproves all contracts entered into between its members and their employers. The general president of the International has full power to determine who shall be members of the International, which determination is binding on the locals. The general president (a constitutional officer of the International) settles and determines all grievances and disputes submitted to him by joint councils and local unions. Whenever the general president makes a decision, or orders a local union to observe the union laws, and the local refuses to do so, the International may suspend or revoke the charter of the local. The by-laws of local unions are subject to the approval of the general president. The general president may appoint a trustee to take charge and complete control of the affairs of a local union. The trustee's acts are sunject to the supervision of the general president and he may remove trustees at any time, and may appoint successor trustees. He may, in his descretion restore selt-government to a local union. The general president, when he deems it for the best interests of the International (which is composed of local unions), is empowered to remove any International organizer.
 
 
 24
 The charters of all local unions remain the property of the International. It may demand and receive the charter of any local at any time, and upon surrender of the charter all property of the local, including money on hand, becomes the property of the International. The local must secure office supplies from the International. The International may control membership of the local. The International possesses power to assess local members and assess per capita taxes. The International controls secretarytreasurers of local unions, even to the extent of directing the increase and decrease in the amount of bonds to be furnished by such officials. The International has complete authority to audit the books of all locals. Before a local union is allowed to become involved in a strike, lockout, boycott, lawsuit or any serious difficulty such local union must immediately notify the joint council, of which it is a member, of the nature of the difficulty and of the action contemplated. The joint council then takes steps to approve or dispprove such contemplated action. The joint council then motifies the general president of the steps it has taken with respect ot the proposed action. The general president is authorized to approve, disapprove, or modify the action of the joint council. Ay local desiring to present a wage scale to its employers first submits a copy of the same to the joint council, if one exists in its city or vicinity. Should the same receive approval by the joint council, it is compulsory upon the local union to forward a copy of such wage scale to the general president for his approval before it is presented to any employer. The general president has the power to inquire into conditions surrounding the local union and if, in his judgment, conditions do not warrant its presentation, he immediately notifies the local union of his decision in the matter. A copy of the wage scale must be in the hands of the general president at least thirty (30) days before presentation to the employer. No contract entered into between a local union and any employer is valid and binding upon a local union until approved by the general president (unless approval thereof is at any time specifically waived by him or his representative).
 
 
 25
 The International general president has complete control over the by-laws of the joint council, and all locals must affiliate ate with a joint council, comply with its laws, and obey its orders. All local unions must affiliate with and participate in activities of conferences when and to the extent ordered by the General Executive Board (of the International) in its discretion.
 
 
 26
 The International controls locals and their memberships through the provisions relating to Trials and Appeals of Local Officers and Members. The International dictates and/or controls the conduct of the local in the administration of its business, who shall be the local's officer, the local officers' duties, and the rules of order for the conduct of local union meetings.
 
 Summary of Conclusions of Law
 
 27
 The Trial Court concluded that during the period of July 12-23, 1957, the plaintiffs were engaged in an activity affecting commerce; that the defendants, Local 984 and the International, are labor organizations within the purview of, and subject to, the Labor-Management Relations Act; that on July 12, 1957, the primary situs of the labor dispute between Local 984 and the International on the one hand, and HumKo on the other, was at the Thomas Street plant of HumKo in Memphis, Tennessee; that the placing of the pickets at HumKo's Champaign plant constituted a secondary boycott in violation of Title 29, U.S.C.A. 187; that the acts of Local 984, in sending pickets from Memphis, Tennessee, the situs of the primary employer, HumKo, to Champaign, Illinois, and in setting up a picket line at the construction site there, had the effect of inducing and encouraging the employees of Phillipy and Kuhne, secondary neutral employers, to strike or engage in a concerted refusal to work or perform services for Phillipy and Kuhne which, in turn, resulted in forcing Phillipy and Kuhne to cease doing business with HumKo; that the International, by exercising control over Local 984, by virtue of its employees' (acting within the scope of their authority) participation in collective bargaining negotiations with the primary employers, and by instructing and directing the pickets at the situs of the secondary employer, had knowledge of, participated in and ratified the acts and conduct of its Local 984; that thereby, with Local 984, the International established and maintained a secondary boycott at the Midwest Refinery of HumKo at Champaign, Illinois; that the plaintiffs are entitled to recover all damages which flowed directly and proximately from the establishment of the proscribed secondary boycott, HumKo having suffered damage to its business in the amount of $57,013.05, Phillipy having suffered damage to its business and entitled to recover damages in the amount so suffered, and Kuhne having suffered damage to its business and entitled to recover damages in the amount suffered.
 
 Discussion
 
 28
 Under the provisions of Rule 52(a), F.R.Civ.P., 28 U.S.C.A., this Court is bound by the findings of fact of the Trial Court unless they are clearly erroneous. In applying this rule in McAllister v. United States, 1954, 348 U.S, 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20, the Supreme Court enunciated the following test:
 
 
 29
 'A finding is clearly erroneous when "although there is evidece to support, it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed,' United States v. Oregon (State) Medical Society, 343 U.S. 326, 339 (72 S.Ct. 690, 698, 96 L.Ed. 978); United States v. United States Gypsum Co., 333 U.S. 364, 395 (68 S.Ct. 525, 541, 92 L.ed. 746).'
 
 
 30
 In analyzing the findings of fact of the Trial Court below in the light of this standard as our test, a review of some of the testimony adduced at the trial is illuminating.
 
 
 31
 George Nesbmith testified that he was a resident of the State of Illinois; that he was a member of the Painters' Union for 14 years; that on the 12th day of July, 1957, he was employed at the Midwest Refinery of HumKo, and that he and his group were in the process of spraying ceilings in the refinery; that prior to the 12th day of July he was foreman of the painters on the job and had 6 painters working under him; that on the 12th day of July he went to the Midwest Refinery for the purpose of going to work; that when he arrived at the gate of the plant he observed electricians, carpenters, bricklayers and steam fitters idling around the gate; that he talked to two men who were standing in the center of the driveway and asked them if he could get into the plant because he had paint in the spray cans in the plant and the paint had to be cleaned out or it would be ruined; that they talked it over and told him that he could go in if he did not take anything in, but that he couldn't bring anything out; that he could go in and clean up the equipment and get out as quickly as he could, and that he hurriedly got the equipment clean and came right out past the gate; that of the 6 men who were working under him as painters none went to work on July 12, 1957, because it was against the union rules to go across the picket line; that he returned to the plant almost every day for around 12 working days after the 12th of July and until the 23rd of July, and he observed that there was no one going through the gate and that he saw pickets at the entrance gate; that none of the painters working under him did any work toward the construction of the refinery during the period between July 12 and July 23, 1957; that he took his orders on the job from the Superintendent of Kuhne-Simmons Company.
 
 
 32
 The same story, in broad outline, was told by the witness Ernest Smith, who was a resident of Urbana, Illinois, and employed at the Midwest Refinery at Champaign as a roofing foreman on July 12, 1957, and in charge of a crew of 5 also testifying to the same effect was William Paul, a resident of Champaign and employed by Kuhne-Simmons Company as one of 15 carpenters; Joe Vaughn of Champaign also testified that he was a masonry foreman heading a crew of 8 to 12 men, and his testimony paralleled that of Nesmith and Paul. The import of the Testimony of these four witnesses is the same--- men attempting to go to work, confronted with a picket line and unable to cross the picket line because of union prohibition.
 
 
 33
 There was testimony by witnesses who were employed at the HumKo plant in Memphis, Tennessee. One of these, John Council, testified that he was working at the HumKo plant at Memphis, Tennessee, as a machine operator during the time when the strike was called at that plant, and at the time of his testimony he was still employed at the HumKo.plant at Memphis, Tennessee; that he worked the picket line at the HumKo plant at Memphis during the progress of the strike; that he attended meetings of Teamsters Union Local 984 during the strike; that he also attended meetings of this Local after the pickets were withdrawn from the HumKo plant at Champaign, Illinois, these meetings being held also at Memphis, Tennessee, and he identified union officials present at the meeting as Mr. Farrell, Mr. Koppeis and Mr. Kuhns; that at the metting in the union hall at Memphis, after the picket line had been withdrawn at Champaign, he heard a statement made by one of the three aforesaid officials of the Union that 'they had to withdraw the pickets, they were against construction and not against HumKo employees.' He further heard one of these union officials make the statement that the picket line would be reinstated in Champaign when the plant started producing.
 
 
 34
 Additional testimony by witnesses employed at the Memphis plant was given by James Monasco, an operator in the deodorizing department, by Norman Johnston, a truck driver, and by William Kean, a maintenance worker. Their testimony was all of the same import and a composite of their testimony reveals
 
 
 35
 that they participated in the strike conducted at the Memphis plant: that they heard particular union officials (naming them) state unequivocally that the strike at Champaign was to cause the cessation of the construction work there; that men were needed to go up to Champaign from Memphis to replace the pickets; that the picket line was effective in stopping the construction work; that the Local had 100% Backing by the International; that the Local paid the expenses of the pickets imported to Champaign from Memphis; that when the picket line at the Champaign plant was withdrawn the union officials were satisfied there would be at least a 5-month delay in the resumption of construction of this plant because of the disbursement to all parts of the country of the contractors and employees occasioned by the picketing; that there was no effort made to prevent HumKo employees in the category of office workers and engineers from entering the plant-- no effort, in other words, to engage in primary picketing.
 
 
 36
 From the contents of the foregoing, together with a detailed examination of all of the evidence, this Court 'is left with a definite and firm conviction' that no 'mistake has been committed,'[1] that there is substantial evidence to support the findings of the Trial Judge, and to satisfy us that the object or purpose of the picket line at the Midwest Refinery of HumKo at Champaign, Illinois, from July 12, 1957, to July 23, 1957, was to stop construction work on this refinery, and that this objective was achieved as a result of the picketing operation. The picketing brought about a complete stoppage of all construction work from July 12 up to and including July 23, 1957, at the construction site. True it is that there exist conflicts in the testimony when a comparison is made of the testimony of the witnesses on direct examination with that developed on cross-examination, but such conflicts are for resolution by the trier of the facts. Akron Dry Goods Company v. Commissioner of Internal Revenue, 6 Cir., 1954, 218 F.2d 290.
 
 
 37
 There is substantial evidence that when the union officials at Memphis sent their union members from Memphis to Champaign they did not have primary picketing as an objective. This is bolstered by evidence to the effect that there was neither intention nor errort to exert pressure of any kind upon the salaried, supervisory and engineering employees of HumKo at Champaign and that, in fact, no pressure was exerted upon them-- they were free to come and go as they pleased.
 
 
 38
 It is not disputed that as of July 12, 1957, the plant was in the process of construction, and that it was not in production. This serves to support the theory that there could not have been lawful primary picketing at this plant. Since the plant was in the process of construction, it would not have been possible for a production schedule to have been in operation.
 
 
 39
 The agreement to furnish all labor and material, and for the installation and erection of the Midwest Refinery of HumKo Company at Champaign, Illinois, was executed between the HumKo Company, a Tennessee corporation, as the owner, and the Kuhne-Simmons Company, Inc., an Illinois corporation, as contractor, under plans and specifications prepared by Kraft Foods Company Engineering Department, Howard A. Tonsager, Architect, of Chicago, Illinois; this contract further providing that 'All work shall be performed in accordance with instructions of Architect's Superintendent or Executive Engineer subject to the provisions of Paragraph 3 Hereunder.' Paragraph 3 is as follows:
 
 
 40
 'The Owner may at any time and from time to time during the progress of the work, without in any way rendering void the contract, order alterations in, additions to, or deductions from the work, and when so ordered in writing the Contractor shall promptly proceed with such changes without causing delay.'
 
 The contract further provides:
 
 41
 'Payment of the remaining ten percent (10%) of such request shall be made within thirty (30) days after the completion of all work and final acceptance by the Owner of all materials and workmanship in accordance with the terms of this contract; * * *.'
 
 
 42
 The completion date specified in this construction contract is covered by the following provision:
 
 
 43
 'The Contractor agrees to commence work hereunder promptly, to prosecute such work diligently and to complete all of such work in accordance with said plans and specifications and the terms hereof on or before August 16, 1957.'
 
 
 44
 As senior vice president of the HumKo Company, J. H. Kirby testified that he was in charge of production and research for the entire HumKo division, and that the Midwest Refinery plant of the HumKo Company began production on a limited basis in the first week of January 1958.
 
 
 45
 The appellants cite extensive authority for the proposition that picketing of a primary employer, at a place of business of the primary employer (even though not the situs of the dispute) is legitimate, even though the effect of such lawful picketing is to induce employees of others engaged on the same site to refuse to cross the picket line. In appellants' letter memorandum of February 5, 1960 to this Court, they further contend that 'assuming arguendo that it was the union's intent to induce or encourage the employees of the contractors to engage in a concerted refusal to work, so as to require the contractors to cease doing business with National HumKo, then our answer is still that such conduct is legal because it occurred at a situs owned, occupied and controlled by the primary employer and is protected conduct under Section 13 of the Act.' As authority for this they cite Local 618, Automotive, Petroleum, etc., Union v. N.L.R.B. (Site Oil), 8 Cir., 1957, 249 F.2d 332; and Seafarers Intern. Union, etc. v. N.L.R.B. (Salt Dome), 1959, 105 U.S.App.D.C. 211, 265 F.2d 585.
 
 
 46
 In analyzing all of the authority to which the appellants have referred, and in attempting to apply it to the facts as they appear in this controversy, we can only say that we take no issue with appellant's citations, and would readily apply them if we had under consideration a factual situation which fitted into the mold of the citations. We fail to recognize comparable situations between the facts here and those present in the cases upon which appellants rely.
 
 
 47
 Of the Taft-Hartley Act, the Supreme Court has said that it
 
 
 48
 'was designed to protect the public interest, but not in the sense that the public was to be shielded from secondary boycotts no matter how brought about. Congress' purpose was more narrowly conceived.
 
 
 49
 'It aimed to restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and, as Congress evidently judged, dangerous practice of unions to widen that conflict; the coercion of neutral employers, themselves not concerned with a primary labor dispute, through the inducement of their employees to engage in strikes or concerted refusals to handle goods.' Local 1976, United Brotherhood of Carpenters and Joiners of America, A.F.L. et al. v. National Labor Relations Board, 1958, 357 U.S. 93, 100, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186.
 
 
 50
 In our consideration of the various facts relative to the category of the picketing at the Champaign plant of HumKo-- whether it was primary or secondary-- the following picture has presented itself:
 
 
 51
 An owner of a piece of property who has contracted with a general contractor to install and erect a building, including the furnishing of all labor and material, for the price of $1,942,471, with the right of supervision in the architect; a completion date of August 16, 1957; a provision for final acceptance by the owner; a work stoppage preventing construction of the building brought about by a picket line transported 400 miles to the site for the express purpose of delaying construction at a time when construction was only 75% Completed, the owner of the property being a primary employer of employees at its plant in Memphis; a labor dispute at the Memphis plant and failure of the Local to petition for bargaining rights at Champaign; picketing inaugurated at a time when the possession of the plant was still in the general contractor pursuant to the provisions of the construction contract; a 12-day work stoppage (resulting in a construction delay) at a time approximately six months before the owner of the plant began production (limited) in the normal operation of its business; no labor dispute being in existence between the contractor and/or subcontractors and their employees; the picket line being the cause of the refusal of the employees to continue work; the Union, in fact, inducing and encouraging the employees of the general contractor and of the subcontractors to engage in a concerted refusal to perform the services for which they were employed; the object of such action (clause above) being to force the general contractor to cease doing business with the owner.
 
 
 52
 This picture presents a form of picketing that has been determined by this Court in United Brick & Clay Workers v. Deena Artward, Inc., 6 Cir., 1952, 198 F.2d 637, 642, to have 'extended beyond the limits of primary picketing and constituted a secondary boycott through pressure on the general contractors' and to have been 'in violation of 303(a)(1) of the Labor Management Relations Act hereinabove set out.' (See Appendix for text of 303(a)(1), 29 U.S.C.A. 187.)
 
 
 53
 The International Union, as appellant, additionally contends that it did not participate in, authorize, or ratify, or otherwise engage in such conduct as to become liable for the acts and conduct of the appellant Local 984, or the agents, or any member of this Local; whether the International Union is liable depends upon the conduct and/or activity of Francis J. Murtha who, during the period involved in this controversy, identified himself as a general organizer of the International Union living in Memphis, Tennessee, who made use of a desk and telephone in the office of Local 984, and who also used his home as an office, and whose duties during the year 1957 were those of a union investigator and negotiator, and worker in the preparation of arbitration cases. He testified that during the year 1957, Local 984 did not request approval, sanction, or assistance from the International in connection with the strike against HumKo. The testimony further established:
 
 
 54
 that Murtha, in his capacity as a representative of the International Union, participated in negotiations with HumKo to assist members of Local 984; that Murtha's participation in this respect was prior in time to the picketing at Champaign, continued through such period, and was still going on when the pickets were withdrawn from the plant at Champaign by the Union; that Murtha had actual notice that picketing was going on at Champaign while the building was under construction; that he had actual knowledge of a complaint filed with the National Labor Relations Board in Chicago by a neutral employer at Champaign, in relation to the picketing of the construction job by the union pickets.
 
 
 55
 It is not unreasonable to believe that before embarking on a 400-mile trip with a group of union members for the purpose of a picketing operation, the officials of the union would, in preparation for such a trip, make inquiry as to the situation at the site where they would commence the picketing before they authorized such an undertaking. There is nothing 'wildcat' about a 400-mile trip taken by a group of adults, with a union official in charge. In preparing for this trip the officials of the union knew, or should have known, that the picketing was going to take place at a plant that was under construction-- not completed-- and not in production. The officials who were in a position to know of the conditions that would confront the pickets at the end of the 400-mile trip included Mr. Murtha, because of his close association with Local 984, as a representative of the International Union.
 
 
 56
 It is unrealistic to believe that Mr. Murtha, as a paid investigator for the International Union, would not have had facts in his possession which were indicative of a clearcut violation of a mandatory provision of the constitution of the International Union-- that Local 984 was becoming involved in a boycott (Champaign) and in a lawsuit (with the neutral employer and the National Labor Relations Board at Chicago) without giving the Joint Council immediate notice, and thus indirectly the General President of the International Union, of the contemplated action, or of the serious difficulty (the lawsuit). Mr. Murtha would further have us believe that he stood idly by, as a paid investigator of the International Union, and did not make this violation known to his superiors in the International Union.
 
 
 57
 The dominion exercised over the Local Union by the International, as evidenced by the constitutional requirements previously set forth in the summary of the findings of fact, as well as by many other provisions of the constitution, establishes a status of parenthood that brings the local union into the family by depriving such local union of that degree of independence associated with, and a necessary ingredient of, an autonomous organization. Since Mr. Murtha, as the representative of the parent organization, was an active participant in the activities of the Local at Memphis, and since the secondary boycott at Champaign was conceived in the environment surrounding Mr. Murtha (at Memphis), he and his principal, the International, knew, or should have known, of the secondary boycott in Champaign. By its silence and inaction, the International, through Mr. Murtha, acquiesced in and condoned the illegal activity of the Local Union at a time when there was full opportunity to step in and prevent such activity. Therefore the International is liable as a principal actor in bringing about a secondary boycott. It is impossible for it to have been as close to the affairs of Local 984, through the participation of Mr. Murtha, its agent, without its being a part of the activity of the Local. Certainly, from Mr. Murtha's dealings with Local 984 in the negotiations with HumKo in the labor dispute (out of which the secondary boycott at Champaign was conceived), the Trial Court had before it substantial basis for the conclusion that the International did participate in, authorize, and ratify the actions of the Local in this boycott. It did, through Mr. Murtha, acting within the scope of his authority as an International representative, engage in a course of conduct in such a manner as to become liable for the actions of Local 984, and its agents, in the maintenance of the picket line at the HumKo plant at Champaign. Furthermore, the Trial Judge had the opportunity to see and hear the witnesses and was therefore in a position to appraise the credibility of each of them.
 
 
 58
 The appellants contend that, even if liability for the secondary boycott is chargeable to them, the damages found by the District Court are excessive, and are not supported by competent evidence (with the exception of the claims by Phillipy).
 
 
 59
 We are of the opinion that the three judgments which are the subject of this review are supported by substantial and sufficient evidence, which also supports the findings and conclusions of the Trial Judge, that the International Union and Local Union 984 (in all three cases), as well as Farrell and Murtha (each in his representative capacity only), in Cases Nos. 3254 and 3255 are jointly and severally liable to the plaintiffs for the damages entered by the District Court, subject to the modifications hereinafter set forth.
 
 
 60
 Responsible officials of HumKo testified as to losses sustained by that company through the work stoppage brought about by the secondary boycott; Mr. Kuhne, of Kuhne-Simmons Company, who had a background of 30 years as a contractor, testified as to the reasonableness of the charges for equipment that was idled by the work stoppage. He also identified all other losses sustained by his company as losses resulting directly from the illegal work stoppage sponsored by the appellants. In Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 562, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, there is stated the following:
 
 
 61
 'It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount. * * *
 
 
 62
 'Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamengal principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.'
 
 
 63
 The appellants challenge the validity of the Trial Court's award of attorney fees as an element of damages in each of the three claims. The appellees reply by stating that this question has been determined in their favor in International Longshoremen's, etc. Union v. Juneau Spruce Corp., 9 Cir., 1951, 189 F.2d 177, and in International Longshoremen's, etc. Union v. Hawaiian Pineapple Co., 9 Cir., 1955, 226 F.2d 875. An examination of these opinions discloses that neither of them is authority for allowing attorney fees to any of the prevailing parties as an item of damages sustained by reason of the illegal work stoppage at the plant at Champaign. The general rule in relation to awarding damages for attorney fees is 'Attorney's fees can ordinarily be obtained by a prevailing party against an adverse party only by virtue of: 1. A statute or rule of court, or 2. The provisions of a written agreement or contract.' Standard Accident Ins. Co. of Detroit, Mich. v. Hull, D.C.1950, 91 F.Supp. 65, 66.
 
 
 64
 The $1,000 attorney fee paid by HumKo in assisting Kuhne in the removal of the picket line at Champaign, as well as the $1,000 attorney fee paid by Kuhne in filing the charge with the National Labor Relations Board to bring about the removal of the picket line so that they could proceed with the completion of the construction contract, are proper items of damage.
 
 
 65
 Counsel have not cited, nor are we familiar with any applicable statute, rule of court of provision of any written agreement or contract that authorized the Trial Court to award attorney fees as an element of damages.
 
 
 66
 Mr. J. H. Kirby, as senior vice president of HumKo, testified under cross-examination as follows:
 
 
 67
 'Q. Now, you say all of these employees that we are talking about, the so-called trainees, spent a week idle in the hotel? I believe you were clear on that, right? A. Mr. Morris, when the strike started, I told the men to go to the hotel and stay.
 
 
 68
 'Q. All right. A. And exactly the number of days, I don't know, but I believe for practically all of the first week that almost all of them did stay in the hotel. It was about a week later that those fellows, of their own accord, decided to come back.
 
 
 69
 'Q. There was then an interruption in their training (435) as a result of the strike here in Memphis; is that correct? A. That's right, a few days.
 
 
 70
 'Q. That interruption had nothing to do with the picketing in Champaign, did it? A. So far as those few days are concerned, no.'[2]
 
 
 71
 From the foregoing testimony it is impossible for this Court to determine just what days the trainees were idled, and it is further impossible for us to determine from any of the testimony, or from the exhibit that itemizes the alleged damages of HumKo resulting from the secondary boycott, whether the time lost by the trainees, as well as their expenses during this period, as a result of the strike at Memphis (which strike had nothing to do with the picketing at Champaign), are included in the award of damages to HumKo. If so, an adjustment of the award should be made by the Trial Court.
 
 
 72
 As a result of our review of this case, as set forth in the preceding observations and analysis
 
 
 73
 Case No. 13896 is remanded with instructions that the award of damages be adjusted by withdrawing the $5,000 attorney fee as an item of damage, and that consideration be given to an adjustment in the award of damages in the event it is determined that the time and expenses of the trainees at Memphis, who were idled as a result of the Memphis strike, are included in the total award. In all other respects this judgment of the District Court is affirmed.
 
 
 74
 Case No. 13897 is remanded with instructions that the award of damages be adjusted by withdrawing the $3,500 attorney fee as an item of damage. In all other respects this judgment of the District Court is affirmed.
 
 
 75
 Case No. 13898 is remanded with instructions that the award of damages be adjusted by withdrawing the $5,000 attorney fee as an item of damages. In all other respects the judgment of the District Court is affirmed.
 
 
 76
 This case is hereby remanded to the District Court for proceedings not inconsistant with the views expressed herein.
 
 APPENDIX
 
 77
 page
 
 
 78
 Section 303(a) of the Taft-Hartley Act-- 29 U.S.C.A. 187 .......... 1
 
 
 79
 Questions for review on appeal, as submitted by appellants .......... 3
 
 
 80
 Counterstantment of questions for review on appeal, as submitted by appellees ...................... 4
 
 Section 303(a) of the Taft-Hartley
 Act 29 U.S.C.A. 187[3]
 
 81
 29 U.S.C.A. 187. 'Boycotts and other unlawful combinations; right to sue; jurisdiction; limitations; damages.
 
 
 82
 '(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is--
 
 
 83
 '(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;
 
 
 84
 '(2) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
 
 
 85
 '(3) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees under the provisions of section 159 of this title;
 
 
 86
 '(4) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class unless such employer is failing to conform to an order or certification of the National Labor Relations Board determining the bargaining representative for employees performing such work. Nothing contained in this subsection shall be construed to make unlawful a refusal by any person to enter upon the premises of any employer (other than his own employer), if the employees of such employer are engaged in a strike ratified or approved by a representative of such employees whom such employer is required to recognize under subchapter II of this chapter.
 
 
 87
 '(b) Whoever shall be injured in his business or property by reason or[4] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit. June 23, 1947, 3:17 p.m., E.D.T., c. 120, Title III 303, 61 Stat. 158.'
 
 
 88
 Questions for Review on Appeal, as Submitted by Appellants
 
 
 89
 '1. Under 303(a) of the Taft-Hartley Law (29 U.S.C.A. 187(a)), may a labor union, without regard to the 'situs' of its labor dispute, follow the primary employer to a site occupied by him together with secondary employers and publicize its dispute by picketing the primary employer at one of his places of business removed from the 'situs' of the dispute, where such picketing has the effect to induce employees of secondary employers to engage in work stoppage?
 
 
 90
 '2. Where certified Union's object is to require primary employer to bargain does the proviso to Section 303(a)(2) of the Taft-Hartley Act (29 U.S.C.A. 187(a)(2)) permit union to induce employees of secondary employers to engage in work stoppage?
 
 
 91
 '3. Are the findings of the District Court with respect to (1) Appellees' activities at its place of business in Champaign, Illinois; and (2) Appellants' activities and purposes in Champaign, Illinois; 'clearly erroneous' within the meaning of Rule 52, F.R.C.P.?
 
 
 92
 '4. Are the District Court's findings and conclusions as to damages clearly erroneous?'
 
 
 93
 Counterstatement of Questions for Review on Appeal, as Submitted by Appellees
 
 
 94
 '1. Did the appellants, International Teamsters Union, and International Teamsters Local 984 of Memphis, Tennessee, which were on strike against HumKo at its manufacturing plant at 1702 Thomas Street, in Memphis, Tennessee, its normal place of business, post pickets at a construction job in Champaign, Illinois, to induce the employees of independent contractor employers constructing that plant to engage in a concerted work stoppage with an object of the picketing being to force these contractor employers to cease performing their contracts with each other or with HumKo?
 
 
 95
 '2. Did International Teamsters Union expressly or impliedly, (or is it estopped to deny that it did), authorize, ratify, participate in or render guidance to its Local 984 in the strike and the use of picketing to induce the employees of independent contractors constructing a plant for HumKo at Champaign, to engage in a concerted work-stoppage where an object of the picketing was to force these contractor employers to cease performing their contracts with each other or with HumKo so as to make it liable to Kuhne-Simmons Co., Inc., for damages?
 
 
 96
 '3. Are the findings of fact by the District Court with respect to appellants' activities and purposes constituting a secondary boycott clearly erroneous on the evidence?
 
 
 97
 '4. Are the District Court's findings as to Kuhne-Simmons Co., Inc.'s damages clearly erroneous on the evidence?'
 
 
 
 [1]
 McAllister v. United States, 1954, 348 U.S. 19, 20, 75 S.Ct. 6, 8, supra
 
 
 [2]
 Appendix 305a, Joint Volume I, filed with this Court as part of this appeal
 
 
 [3]
 Not including the September 14, 1959, Amendment
 
 
 [4]
 So in original. Probably should read 'of.'