F. Carl SCHNABEL, Joseph William
Curtin, Ronald Hunsicker, and
Schnabel Associates, Inc.,

v.

BUILDING AND CONSTRUCTION
TRADES COUNCIL OF PHILADEL-
PHIA AND VICINITY, AFL–CIO, et al.

Civ. A. No. 82–2256.

United States District Court,
E.D. Pennsylvania.

April 13, 1983.

Lawrence S. Coburn, Philadelphia, Pa., for F. Carl Schnabel, Joseph William Curtin, Ronald Hunsicker, and Schnabel Associates, Inc.

Richard B. Sigmond, Philadelphia, Pa., for Bldg. & Const. Trades Council of Philadelphia and Vicinity, AFL–CIO Local 921, Intern. Broth. of Painters and Allied

Trades, Local 654, Intern. Broth. of Elec. Workers, Ralph Williams, Patrick Gillespie, Edward McClintock, Hugh M. Snow.

William Einhorn, Philadelphia, Pa., for Metropolitan Dist. Council of Phila., United Broth. of Carpenters and Joiners of America, and Earl Henninger.

Gordon Gelfond, Philadelphia, Pa., for Local 542 Intern. Union of Operating Engineers and Charles Priscopo.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

On May 21, 1982, plaintiffs, Schnabel Associates, Inc. ("SA"), F. Carl Schnabel, President of SA, Joseph William Curtin, a construction worker for SA and Ronald Hunsicker, a construction manager for SA (collectively referred to as the "individual plaintiffs"), filed a ten count complaint against the defendants, Building & Construction Trades Council of Philadelphia and Vicinity, AFL–CIO ("the Council"), Local 542, International Union of Operating Engineers, Local 921, International Brotherhood of Painters and Allied Trades, Local Union 654, International Brotherhood of Electrical Workers, Metropolitan District Council of Philadelphia, United Brotherhood of Carpenters and Joiners of America (collectively referred to as the "union defendants"), Ralph Williams, former Business Manager of the Council, Charles Priscopo, a delegate to the Council and Business Agent of Local 542, Edward E. McClintock, Business Representative and Financial Secretary of Local 921, Hugh M. Snow, Business Manager of Local 654, Earl Henninger, Business Representative of Carpenters and various John Does and Richard Roes (collectively referred to as the "individual defendants"). The complaint states that since around November 4, 1981 the defendants have engaged in unlawful picketing and other illegal and at times violent conduct[1] at four job sites at which SA is an open shop general contractor in order to induce subcontractors, suppliers, construction owners and users from doing business with SA. In count one, SA avers that the behavior of the Council and the union defendants violates § 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(b)(4), and § 303 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 187. Part of the recovery SA seeks in this count is an award of punitive damages and attorneys' fees. Count two states that the defendants' behavior constitutes a violation of the Civil Rights Act of 1871, 42 U.S.C. §§ 1985(3) & 1986 (also known as the "Ku Klux Klan Act") because it has the intended purpose and effect of depriving plaintiffs, who are persons with no affiliation with organized labor, of equal protection of the law, specifically the right to freely travel and associate with each other in the pursuit of their employment relations and the right guaranteed under § 7 of the NLRA, 29 U.S.C. § 157, to refuse to associate with a labor organization. In count three, SA asserts that the defendants and other co-conspirators have violated sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. Similar-

---

1. Specifically, the complaint alleges that:

 The aforesaid picketing and related activities of Defendants Council, Local 542, Local 921, Local 654 and Carpenters, as directed and participated in, counseled or abetted, in whole or in part, by the individual Defendants and others, have been violent, forceful, intimidating, threatening and coercive in nature, and have included, but not been limited to, such activities as: causing picketers and others to mass in entrances and exits so as to block vehicular ingress and egress; attacking and thereby damaging vehicles, both those of Plaintiffs and others, seeking to enter and leave job sites, and attempting to enter and remove occupants thereof; yelling loud, obscene and vile epithets at persons seeking to enter and leave job sites, damaging or destroying construction materials being transported to or upon the job sites; attacking job trailers and other facilities located on job sites; discharging explosives and throwing rocks, bottles and other objects at the individual Plaintiffs and others, including the employees of Plaintiff SA, seeking to work and associate with each other on the job sites, and threatening and offering to do physical harm to Plaintiff SA's employees, to the employees of subcontractors and suppliers, and to the employees of security firms whom Plaintiff SA has been compelled to hire to protect its job sites.

 Complaint ¶ 25; Amended Complaint ¶ 26.

ly in count four SA contends that the defendants themselves have undertaken actions proscribed by these antitrust statutes. Lastly, counts five through ten allege various state law causes of action.[2]

Defendants have moved to dismiss count one as to all the defendants but the Council and counts two through ten in their entirety. Regarding count one, defendants assert that the complaint fails to state a claim upon which relief can be granted against the union defendants because it fails to contain enough factual allegations to pass muster even under the liberal notice pleading required by the federal rules.[3] Defendants also ask that SA's requests for punitive damages and attorneys' fees be stricken. As to count two, defendants contend that the plaintiffs have again failed to plead with specificity, that the plaintiffs do not belong to a class of persons targeted for protection by § 1985(3) and that plaintiffs cannot rely upon violations of § 303 as a basis for recovery under § 1985(3). Defendants further contend that having failed to plead a cause of action under § 1985, plaintiffs have not stated one under § 1986. Concerning SA's antitrust counts, defendants again assert that they lack the requisite specificity under the federal pleading rules. They also argue that these counts as pled do not invoke jurisdiction under the Sherman Act and do not survive the exemptions afforded organized labor from the antitrust laws. Defendants also assert that plaintiffs have not adequately pled any causes of action against the individual defendants because they have not properly pled any federal causes of action against them. Lastly, defendants contend that counts five through ten do not set forth enough detail to state causes of action against the Council and the union defendants.

I will address each one of these arguments in turn. Before addressing the merits of the motion, however, there is a threshold issue I must resolve. After the defendants filed their motion to dismiss, plaintiffs filed an amended complaint along with their reply to the motion. Plaintiffs rely in part on this amended complaint in their reply. Some of the defendants assert the plaintiffs were not free to file the amended complaint without leave of court. Therefore, they conclude that it is not properly before me for consideration.

Rule 15(a) of the Federal Rules of Civil Procedure provides that "[a] party may amend his pleading once as a matter of course at any time before a responsive pleading is served...." Rule 7(a) defines pleadings as "a complaint and an answer; a reply to a counterclaim ...; an answer to a counterclaim...; a third-party complaint...; and a third-party answer...." By interpreting these two rules together, it is almost universally held that a motion to dismiss does not constitute a responsive pleading which terminates a plaintiff's right to amend as a matter of course. *See* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1483 (1971 & Supp.1982); 3 *Moore's Federal Practice* ¶ 15.07[2] (1982 & Supp. 1982–83); *Kelly v. Delaware River Joint Comm'n*, 187 F.2d 93 (3d Cir.), cert. denied, 342 U.S. 812, 72 S.Ct. 25, 96 L.Ed. 614 (1951). *Cf. Neifeld v. Steinberg*, 438 F.2d 423, 425 n. 3 (3d Cir.1971) (motion to strike defenses not a responsive pleading). *See also Drennon v. Philadelphia General Hospital*, 428 F.Supp. 809 (E.D.Pa.1977); *Bates v. Western Electric*, 420 F.Supp. 521, 524 n. 1 (E.D.Pa.1976). Thus plaintiffs' amended complaint is properly before me.

In evaluating the merits of defendants' motion, I must accept as true the well-pleaded allegations of the amended complaint and construe them in the light most

---

**2.** Count five alleges that the actions of the Council and the union defendants have interfered with SA's performance of its lawful vocation. Count six through eight contend that the defendants intentionally inflicted the individual plaintiffs with severe emotional distress and committed an assault and battery upon them.

Lastly counts nine and ten allege that the defendants interfered with SA's contractual relationships and caused SA to lose prospective economic advantages.

**3.** SA does not seek recovery against the individual defendants in count one.

favorable to the plaintiffs. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). It is well-established that a complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] which would entitle [them] to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957) (footnote omitted). With these guidelines in mind, I now turn to the substance of defendants' motion.

## COUNT ONE

The role a complaint plays in federal civil practice is a limited one:

> It is not necessary to plead evidence, nor is it necessary to plead facts upon which the claim is based. "To the contrary, all the Rules require is 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

*Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 446 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), *quoting Conley v. Gibson,* 355 U.S. at 47, 78 S.Ct. at 103.[4] *See* Fed.R.Civ.P. 8(a). Despite this liberal interpretation, defendants nonetheless assert that count one fails to state a cause of action against the union defendants. Defendants' assertion must fail.

■ Count one more than adequately gives these defendants fair notice of SA's claim under § 303:[5]

24. Beginning on or about November 4, 1981, and continuing thereafter to the present time, Defendant Council, acting for itself and also acting through or on behalf of Defendants Local 542, Local 921, Local 654 and Carpenters, and each and all of those Defendants, acting in whole or in part through or under the direction of their agents, including the individual Defendants Williams, Gillespie, Priscopo, McClintock, Snow, Henninger and others, have engaged in picketing and related activities at all entrances and exits to the above-identified construction project job sites, both while Plaintiff SA has been engaged in operations thereon and at times when it has not been so engaged.

25. The aforesaid picketing and related activities of Defendants Council, Local 542, Local 921, Local 654 and Carpenters has taken place at all entrances and exits to the above-identified construction project job sites, both while Plaintiff SA's subcontractors have been engaged in operations thereon, and at times when they have not been so engaged.

\* \* \* \* \* \*

27. At various times since November 4, 1981, and continuing, the enumerated Defendants have engaged in conduct, both at the aforesaid job sites and at other places removed therefrom, whereby they have, both successfully and unsuccessfully, by both direct and indirect means, sought to force, compel or otherwise induce other persons, including but not limited to actual and potential subcontractors, suppliers, and construction owners and users, from doing business with, or from continuing to do business with, Plaintiff SA.

28. An object of the aforesaid picketing and related activities of Defendants Council Local 542, Local 921, Local 654 and Carpenters has been to force Plaintiff SA and certain suppliers to cease or

---

**4.** Rule 9 enumerates certain exceptions which are not pertinent here.

**5.** Section 303 provides:
> (a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

> (b) Whoever shall be injured in his business or property by reason or [sic] any violation of subsection (a) of this section may sue therefor in any district court of the United States ... or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

refrain from doing business with Plaintiff SA's subcontractors.

29. By engaging in the aforesaid conduct and activities, Defendants Council, Local 542, Local 921, Local 654 and Carpenters have also continuously violated the proscriptions of § 8(b)(4) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 157 [158](b)(4) and of § 303 of the LMRA, 29 U.S.C. § 187. The said conduct and activities of the enumerated Defendants have had the intended and actual effect of disrupting business relationships between Plaintiff SA and various of its subcontractors, suppliers and other third parties with whom it has done business or has sought to do business.

30. The aforesaid conduct and activities engaged in by the Defendant Council and by the other Defendant labor organizations in violation of § 8(b)(4) of the NLRA continued long after December 15, 1981 in violation also of a Consent Decree, issued on that date by the United States District Court for the Eastern District of Pennsylvania. (Civil Action 81–4976).

Amended Complaint ¶¶ 24–25 & 27–30. *See* note 1 *supra.* I am satisfied that these paragraphs in count one give the union defendants adequate notice of SA's claims against them.

■ Defendants cite numerous cases which stand for the proposition that local unions will be held liable only where there is evidence that their agents carried out the alleged unlawful acts. With this statement I have no quarrel. *See C & K Coal Co. v. UMW,* 704 F.2d 690, at 695 (3d Cir.1983). However defendants go further and state that the law requires the plaintiffs to plead facts *"showing authorization, ratification or any other acts showing the creation of any agency relationship."* Defendants' Joint Memorandum of Law in Support of Their Motion to Dismiss the Complaint, at 8 (emphasis in the original). I can find no support for this position.

None of the several cases cited by the defendants involved a federal district court's resolution of a motion to dismiss.

Most were decisions by the NLRB which was reviewing trial examiners' findings after a full hearing that proof of the requisite agency had either been established or lacking. SA too will have to show such an agency at trial in order to hold the union defendants liable under count one. But at this stage in the proceedings, I am satisfied that SA has adequately pleaded a cause of action against them under § 303.

■ Defendants next ask that SA's request for punitive damages be stricken. Despite SA's assertion to the contrary, I have concluded that punitive damages are not recoverable for violations of § 303 directly. Therefore the defendants' request will be granted.

In *Local 20, Teamsters, Chauffeurs & Helpers Union v. Morton,* 377 U.S. 252, 84 S.Ct. 1253, 12 L.Ed.2d 280 (1964), the plaintiff employer sued the local union for the latter's unlawful secondary activities under both § 303 and state law. One of the district court's findings was that there had been no violence. The precise question presented to the Court was whether a federal court "is free to apply state law in awarding damages resulting from a union's peaceful strike conduct. . . ." *Id.* at 256, 84 S.Ct. at 1257. The court concluded that where peaceful union secondary activities were involved, state law regarding damages was preempted by § 303. Two years later, the Court decided *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). There the Court reaffirmed the holding of *Local 20, Teamsters* but added that "on state claims, though not on § 303 claims, punitive damages may be recovered." *Id.* at 736, 86 S.Ct. at 1144.

■ Reading these two cases together it is clear that state law governing damages arising out of unlawful peaceful secondary activity is displaced by § 303 whereas state law concerning punitive damages for violent secondary activity is not. However, it is also evident that any claim for punitive damages must be based on a state claim and not a § 303 claim. *See Harnischfeger Corp. v. Sheet Metal Workers Internat'l*

*Assoc., AFL–CIO,* 436 F.2d 351 (6th Cir. 1970); *Anderson v. Electrical Workers, Local 712,* 81 Lab.Cas. (CCH) ¶ 13,065 (W.D. Pa.1976); *Hennepin Broadcasting Assoc., Inc. v. NLRB,* 408 F.Supp. 932 (D.Minn. 1975); *Iodice v. Calabrese,* 345 F.Supp. 248 (S.D.N.Y.1972), *aff'd in part and rev'd in part,* 512 F.2d 383 (2d Cir.1975); *Thurston & Sons, Inc. v. R.B. Barber,* 66 Lab.Cas. (CCH) ¶ 12,212 (M.D.N.C.1971).

■ Although decided before *Gibbs,* this conclusion was reached by the Court of Appeals for the Sixth Circuit in *Price v. United Mine Workers,* 336 F.2d 771 (6th Cir.1964), *cert. denied,* 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799 (1965). The defendants there asserted unsuccessfully that § 303 prohibited any state causes of action in tort for conspiracy or malicious destruction of property:

> If [the union's] contention is correct that Congress had preempted the entire field and there is no state or pendent jurisdiction, then the hapless victim of personal injuries, or damages inflicted to his property by unlawful primary activities is left without remedy in either state or federal courts. He could not sue for damages for an assault and battery committed on his person or for malicious destruction of his property or business.

*Id.* at 774. The court decided that Congress did not intend such a result and concluded that "[s]ection 303 does not immunize unlawful acts of force and violence or malicious destruction of property committed by anyone in the course of a strike whether characterized as primary or secondary. It is not a haven for such conduct." *Id.* at 775. Thus § 303 does not bar recovery of

**6.** SA has properly requested punitive damages in their state action counts.

**7.** The circuits had been split on the issue of whether attorneys' fees incurred in unfair labor practice proceedings to terminate a union's illegal secondary activity were recoverable as damages under § 303. Several permitted such a recovery. *See Associated General Contractors of Minnesota v. Construction and General Laborers Local No. 563,* 612 F.2d 1060 (8th Cir.1979); *Texas Distributors, Inc. v. Local Union No. 100,* 598 F.2d 393 (5th Cir.1979); *F.F.*

punitive damages for violations of state law. *See C & K Coal v. UMW, supra,* at 699.

In count one of the amended complaint, SA seeks relief solely under § 303 for violations of § 8(b)(4). If SA prevails under count one, they will not be entitled to punitive damages. Therefore, the request will be stricken.[6]

■ I do not reach the same conclusion, however, with respect to defendants' request to strike SA's prayer for attorneys' fees. Although the oft-cited case of *Alyeska Pipeline Service Co. v. The Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) reinforced the long-standing practice in the United States that parties are, in most instances, responsible for the attorneys' fees incurred in litigating their suits, this "American Rule" is not without its exceptions. One exception is where a statute specifically provides for an award of attorneys' fees to the prevailing party. *Id.* at 254–55, 95 S.Ct. at 1620. Courts have consistently held that § 303 is not such a statute.[7] *See, e.g., F.F. Instrument v. Union de Tronquistas,* 558 F.2d 607 (1st Cir.1977); *Mead v. Retail Clerks Int. Ass'n,* 523 F.2d 1371 (9th Cir.1975).

■ Another exception, however, could conceivably apply to the case before me. Attorneys' fees are also recoverable where a losing party has " 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons' " or where a party wilfully disobeys a court order. *Alyeska Pipeline,* 421 U.S. at 258–59, 95 S.Ct. at 1622 *quoting F.D. Rich Co., Inc.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) and *Fleischmann Distilling Corp. v. Maier Brew-*

*Instrument Corp. v. Union de Tronquistas,* 558 F.2d 607, 611 (1st Cir.1977) (dicta); *Local Union No. 984 International Brotherhood of Teamsters v. Humko Co.,* 287 F.2d 231 (6th Cir.), *cert. denied,* 366 U.S. 962, 81 S.Ct. 1922, 6 L.Ed.2d 1254 (1961). *But see Mead v. Retail Clerks Local 839,* 523 F.2d 1371 (9th Cir.1975). The Supreme Court has recently ruled that fees are not recoverable as damages. *Summit Valley Industries v. Carpenters,* 456 U.S. 717, 102 S.Ct. 2112, 72 L.Ed.2d 511 (1982). *See C & K Coal v. UMW, supra,* at 698.

*ing· Co.;* 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967). This exception could apply to a § 303 case. *See L.J. Maxey, Jr. d/b/a King-O-Meat Co. v. Butcher's Union Local 126,* 627 F.2d 912 (9th Cir. 1980); *F.F. Instrument v. Union de Tronquistas, supra; Mead v. Retail Clerks Int. Ass'n, supra; Food Handlers Local 425 v. Valmac Industries, Inc.,* 528 F.2d 217 (8th Cir.1975). Therefore, because there appears to be a "set of facts in support of [SA's] claim which would entitle [them] to relief," I will not strike their request for attorneys' fees. *See Conley v. Gibson,* 355 U.S. at 45–46, 78 S.Ct. at 102.

## COUNT TWO

 Defendants put forth three reasons why count two which alleges a violation of § 1985(3) should be dismissed. Their first one can be quickly resolved. Defendants assert that plaintiffs are not specific enough in their allegations to survive dismissal. Complaints alleging a cause of action under § 1985(3) must consist of more than "mere conclusory allegations of deprivations of constitutional rights. . . ." *Robinson v. McCorkle,* 462 F.2d 111 (3d Cir.), *cert. denied,* 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed.2d 492 (1972). *Cf. Rotolo v. Borough of Charleroi,* 532 F.2d 920 (3d Cir.1976) (§ 1983). *See United States v. City of Philadelphia,* 482 F.Supp. 1274 (E.D.Pa.1979), *aff'd,* 644 F.2d 187 (3d Cir.1980), and cases cited at 1275–76. To state a claim under § 1985(3), then, the following must be shown:

> (1) a conspiracy by the defendants; (2) designed to deprive plaintiff of the equal protection of the laws; (3) the commission of an overt act in furtherance of that conspiracy; (4) a resultant injury to person or property or a deprivation of any right or privilege of citizens; and (5) defendant's actions were motivated by a racial or otherwise class-based invidiously discriminatory animus.[8]

8. I defer for the moment consideration of whether plaintiffs qualify in fact as such a class. For purposes of this discussion only I find that plaintiffs have satisfactorily alleged that they do.

*Carter v. Cuyler,* 415 F.Supp. 852, 857 (E.D. Pa.1976) *citing Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971). Count two of plaintiffs' amended complaint contains numerous and detailed allegations and incorporates by reference many others so as to satisfy the above criteria.[9] They certainly go well beyond "mere conclusory allegations." As a result, I find defendants' first argument insufficiently persuasive to require dismissal.

Defendants' second contention is a thornier one. They allege that the plaintiffs who are "persons having no affiliation with organized labor in the Greater Philadelphia area, or . . . persons employing or associating with such nonaffiliated persons" do not belong to a class cognizable under § 1985(3). *See* Amended Complaint ¶ 35.

In 1971, the Supreme Court in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971) overruled a century of case law and held that state action was not a necessary element under § 1985(3). The Court also stated "that there must be some racial or perhaps otherwise class-based, invidiously discriminatory animus" to state a claim under the statute. *Id.* at 102, 91 S.Ct. at 1798. The Court did not delineate all such possible classes although it did state race was one such class. *Id.* at 102 n. 9, 91 S.Ct. at 1798 n. 9.

In 1979, our Court of Appeals was called upon to decide whether a group of tenant organizers constituted a class under § 1985(3). The court held that:

> [u]nlike racial or sexual animus, animus against tenant organizers is not based upon "immutable characteristics" for which the members of the class have no responsibility. Nor are we persuaded that tenant organizers have been victims of the historically pervasive discrimination practiced against women.

9. Although length alone is not determinative of the requisite specificity, it is at least worthy of mention that count two contains ten paragraphs exclusive of the prayer for relief and incorporates by reference forty-three others.

*Carchman v. Korman Corp.,* 594 F.2d 354, 356 (3d Cir.), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979), *quoting Novotny v. Great American Federal Savings & Loan Ass'n,* 584 F.2d 1235, 1243 (3d Cir.1978) (en banc), *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

 Defendants first assert that because members of plaintiffs' purported class do not possess any "immutable characteristics" which are accidents of birth, they cannot qualify as being of a class recognized by the statute. There is support for defendants' position. *See Three Rivers Cablevision, Inc. v. Pittsburgh,* 502 F.Supp. 1118 (W.D.Pa.1980). However, I believe that one plausible interpretation of *Carchman* is that there are two prongs on which to base a class. One can belong to either: (1) a class of persons with immutable characteristics; or (2) a class of persons who have been the victims of historically pervasive discrimination. *See Amoco Oil v. Local 99,* 536 F.Supp. 1203, 1213–14 n. 20 (D.R.I.1982). This approach is at least suggested by several cases applying *Carchman. See Banghart v. Sun Oil Co.,* 542 F.Supp. 451 (E.D. Pa.1982); *Brown v. Southeastern Pennsylvania Transp. Author.,* 519 F.Supp. 864 (E.D.Pa.1981); *Shirley v. Bensalem Twp.,* 501 F.Supp..1138 (E.D.Pa.1980), *appeal dismissed,* 663 F.2d 472 (3d Cir.1981); *Marino v. Bowers,* 483 F.Supp. 765 (E.D.Pa.1980), *aff'd,* 657 F.2d 1363 (3d Cir.1981). More importantly, the Third Circuit just recently put to rest the argument that it is settled that only classes with immutable characteristics can maintain a § 1985(3) action in this circuit:

> Some of our cases have spoken about immutable characteristics, but in context those references were merely indications of class characteristics which should be treated analogously with race. The question whether the statute protects against conspiracies, not involving state action, aimed at political classes, as well as classes whose members have the requisite immutable characteristics is an open one in this court.

*C & K Coal v. UMW, supra,* at 698. Therefore, I will consider both prongs. Under either plaintiffs must fail.

Undoubtedly plaintiffs do not belong to a class of persons with immutable characteristics. Thus for count two to survive dismissal, they must establish their class has been subject to historically pervasive discrimination.

The Third Circuit has never had occasion to discuss and fully develop the criteria for qualifying as a class which has been the victim of historically pervasive discrimination. Other courts' attempts at defining classes under § 1985(3) are far from unanimous and represent a range of views from the most narrow to the exceedingly broad. *See Canlis v. San Joaquin Sheriff's Posse Comitatus,* 641 F.2d 711, 719–20 n. 15 (9th Cir.), *cert. denied,* 454 U.S. 967, 102 S.Ct. 510, 70 L.Ed.2d 383 (1981); *Amoco Oil v. Local 99,* 536 F.Supp. at 1213–14 n. 20. The Court of Appeals' opinion in *Carchman,* however, is generally viewed as one evidencing an unwillingness to greatly expand the coverage of § 1985(3). *See, e.g., Canlis v. San Joaquin Sheriff's Posse Comitatus,* 641 F.2d at 719–20 n. 15.

A few cases concerning § 1985(3) classes have arisen in the labor context with different results. The case heavily relied upon by the plaintiffs is the recent decision by the Fifth Circuit in *Scott v. Moore,* 680 F.2d 979 (5th Cir.1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 442, 74 L.Ed.2d 599 (1982).

The facts in *Scott* are very similar to those in the case before me. The plaintiffs were a construction company which employed non-union employees and two such employees. Like here, they sued a trades council, its unions and various union members under § 1985(3) for damages resulting from picketing and violence at the plaintiffs' construction site. One major issue in the case was whether the plaintiffs belonged to a class entitled to § 1985(3) protection. The court, sitting en banc, decided that they were.

The court found that § 1985(3)'s coverage of nonracial classes fell into two categories:

(1) those classes needing special protection under the equal protection clause; and (2) those classes of persons discriminated against because of their political beliefs which Congress intended to protect when it enacted the Ku Klux Klan Act. *Id.* at 991–92. The court recognized that in 1871 when the Act was passed the labor movement had yet to arise. However the court analogized the plight of the plaintiffs to that of the Republicans in the post-civil war reconstruction South. They found that Republicans were repeatedly the victims of Klan violence because of their political beliefs and that they needed federal protection due to the hostility towards them in the region.

The court found that the employee-plaintiffs were in a similar situation. First, they believed that plaintiffs were attacked because of their economic beliefs, a situation close enough to discrimination based on political beliefs. Second, the court found that the region in which plaintiffs worked was "union country" and that the regional hostility towards nonunion labor rose to the same level as that towards Republicans in the south of the 1870's.

The court then determined that the employer-plaintiff also could maintain an action under § 1985(3) because it provides "in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, ... the party so injured ... may have an action for the recovery of such damages occasioned by such injury...." Thus even though the employer-plaintiff was not a member of the class, the court found it could nonetheless recover under § 1985(3).

Although the Fifth Circuit presents reputable authority for me to follow, I find I must reject its conclusion for several reasons elaborated upon below. First, at least one district court has reached a contrary result. Second, another district court, albeit in dicta, has already disapproved of the substantially similar decision reached by the original panel in *Scott v. Moore,* 640 F.2d 708 (5th Cir.1981). Most importantly, I believe that the Third Circuit if presented the issue would adopt the more conservative approach persuasively taken by the eight dissenters in *Scott.* [10]

As the defendants point out, the court in *Western Telecasters, Inc. v. California Federation of Labor, AFL–CIO,* 415 F.Supp. 30 (S.D.Cal.1976) had similar facts as in *Scott* and the instant case. The court there concluded:

> The court is in complete agreement with the lower court in [*Arnold v. Tiffany,* 359 F.Supp. 1034 (C.D.Cal.), *aff'd,* 487 F.2d 216 (9th Cir.1973)]; the animus behind the conspirators' actions must be akin to racial bias. While discrimination based on national origin or religion may provide the necessary animus, discrimination against employees of a non-union entity does not. If the court were to hold otherwise, nothing would prevent the application of § 1985(3) to all conspiratorial interferences with the rights of others. As the Court recognized in *Griffin,* Congress did not intend to create a general federal tort law by the passage of § 1985(3). In order to effectuate the intent of Congress, the conspirators must be motivated by a class-based, invidiously discriminatory animus. This court cannot so characterize the motivation of these defendants.

*Id.* at 33. *See Murphy v. Mt. Carmel High School,* 543 F.2d 1189, 1192 n. 1 (7th Cir. 1976) (dicta that it is doubtful non-union employees comprise a § 1985(3) class).

Moreover, the court in *Amoco Oil v. Local 99, supra,* was unpersuaded by original panel's opinion in *Scott.* The court believed that the legislative history of the Act indicates that a class of persons who associate with non-union contractors is not a class under § 1985(3):

**10.** The Third Circuit expressly declined to address the issues raised by *Scott* in *C & K Coal*

*v. UMW, supra,* at 700.

According to the proponents of the legislation that became § 1985(3), the victims of this terror were chiefly blacks and members of the Republican party, which was associated with Reconstruction, emancipation of the slaves, and the Civil War amendments to the Constitution.... Furthermore, the proponents of the legislation believed that the states were either unwilling or unable to protect these victimized classes, and that these classes were thus politically and socially helpless....

In light of this legislative history, the Court concludes that the conduct alleged in Amoco's complaint likely does not satisfy *Griffin's* requirement of "invidious" discrimination. *Griffin v. Breckenridge, supra,* 403 U.S. at 102, 91 S.Ct. at 1798. *Contra Scott v. Moore,* [640 F.2d] at 721-23. In order for a plaintiff to obtain relief under § 1985(3), it seems that he must belong to a class whose status approaches that of a "discrete and insular minority" or a "historically disadvantaged group." In short, the plaintiff must be part of a group that, like blacks and Republicans in the Reconstruction South, is so socially and politically weak that it cannot effectively protect and enjoy its civil rights.

536 F.Supp. at 1214 n. 20 (citations omitted). *See Comment, A Construction of Section 1985(c) in Light of Its Original Purpose,* 46 U.Chi.L.Rev. 402 (1979).

This view is akin to that expressed by the dissent in the en banc decision in *Scott:*

If the class recognized by the majority includes, as we have supposed, persons who do not belong to a union and who want to work for an employer who hires other non-union employees, there are yet other reasons not to accord such a class § 1985(3) protection. This class is one newly defined by this case, not one having any previous discernible jurisprudential identity. It is not a "class" marked by historical oppression, by minority status, by any social or political animus directed against it, by any political or religious belief, or by any of the indicia usually used to identify a class of persons

who must be accorded special protection. The animus here was not directed at the membership of the plaintiffs in such a class or at their association together either as persons or in some anti-union group campaign, but at their *activities:* working without union membership for an employer who wished to hire them.

680 F.2d at 1918 (Rubin, J. and Wilson, J., dissenting) (emphasis in original). *See United States v. Carolene Products Co.,* 304 U.S. 144, 152-53 n. 4, 58 S.Ct. 778, 783-84 n. 4, 82 L.Ed. 1234 (1938); *Browder v. Tipton,* 630 F.2d 1149 (6th Cir.1980) (class must suffer prejudice which interferes with operation of political process relied upon to protect minorities); *Desantis v. Pacific Telephone & Telegraph Co., Inc.,* 608 F.2d 327, 333 (9th Cir.1979) (§ 1985(3) only covers groups which requires special federal assistance to protect civil rights).

Upon consideration of all these cases and the narrow construction accorded § 1985(3) by our Court of Appeals, I am of the mind that the plaintiffs fail to qualify as belonging to a group or groups which "have been victims of ... historically pervasive discrimination...." *Carchman v. Korman Corp.,* 594 F.2d at 356. Indeed, parties have argued that it is union members and not nonunion persons who are entitled to protection under § 1985(3). *See Brett v. Sohio Const. Co.,* 518 F.Supp. 698 (D.Alas.1981); *Local No. 1 (ACA), etc. v. I.B.T., C., W. & H.,* 419 F.Supp. 263 (E.D.Pa. 1976). *But see Amal. Cloth & Textile Wkrs. v. J.P. Stevens & Co.,* 475 F.Supp. 482, (S.D.N.Y.1979), *vacated on other grounds,* 638 F.2d 7 (2d Cir.1980); *Iowa Beef Processors, Inc. v. Gorman,* 476 F.Supp. 1382 (N.D.Iowa 1979). But this is certainly no longer the case in the large industrialized and unionized areas of the nation.

In my mind, it would be straining credulity to conclude that the plaintiffs here are and in the past were so politically weak that they need special federal protection in order to protect their civil rights to the degree that blacks and Republicans did in

the south of the 1870's. As a result, I find that count two of the amended complaint fails to state a cause of action under § 1985(3).[11] Similarly, because a violation of § 1985 is a predicate for finding a violation of § 1986, plaintiffs' § 1986 claim must likewise fail. *Rogin v. Bensalem Twp.,* 616 F.2d 680 (3d Cir.1980), *cert. denied,* 450 U.S. 1029, 101 S.Ct. 1737, 68 L.Ed.2d 223 (1981); *Brawer v. Horowitz,* 535 F.2d 830 (3d Cir. 1976).

■ An alternative ground for dismissing count two is set forth by the court in *C & K Coal v. UMW, supra.* There, as here, the plaintiffs were several nonunion companies and employees. In affirming the dismissal of their § 1985(3) cause of action, the court stated:

> We are not persuaded that Count IV alleges a claim falling within 42 U.S.C. § 1985(3) even if we assume its applicability to private conspiracies motivated by hostility to the political views of the targets. It is true that the complaint alleges a conspiracy directed against nonunion coal mines and miners because of their political views on union membership or any other subject. Fairly read, the complaint alleges a conspiracy to prevent the sale of nonunion coal so as to advance the economic interests of the defendant unions in their bargaining with the Bituminous Coal Operators Association. Since its revival in *Griffin v. Breckenridge,* 403 U.S. 88 [91 S.Ct. 1790, 29 L.Ed.2d 338] (1971), the Ku Klux Klan Act has never been held to apply to private, economically motivated conspiracies. That, in essence, is what is charged in this instance.

*C & K Coal v. UMW, supra,* at 700. A fair reading of plaintiffs' amended complaint compels the same conclusion in the case before me. Therefore, I find a second reason to dismiss plaintiffs' § 1985(3) claim and thus to support a dismissal of their § 1986 claim.

## COUNTS THREE AND FOUR

Next defendants contend that SA's complaint fails to plead causes of action under the antitrust laws. Defendants assert that: (1) the complaint is not specific enough in its allegations; (2) that it does not satisfactorily plead the necessary impact on interstate commerce; and (3) that as pled the complaint fails to eschew both the statutory and nonstatutory exemptions accorded organized labor from the proscriptions contained in the antitrust laws. Each point will be addressed below.

■ I need spend little time discussing defendants' first contention. As I stated in my discussion of this issue concerning count one, little is required under the federal practice of notice pleading. Counts three and four cover nine pages, contains thirteen paragraphs and incorporates the rest of the amended complaint by reference. Upon reviewing these allegations, I am confident that they are sufficiently specific to give the defendants fair notice of SA's claims. *See Bogosian v. Gulf Oil Corp.,* 561 F.2d at 446.

Next defendants assert that the complaint does not show the requisite impact on interstate commerce to satisfactorily invoke jurisdiction under the Sherman Act. This argument is also unpersuasive.

The Supreme Court has recently decided this issue in *McLain v. Real Estate Board of New Orleans, Inc.,* 444 U.S. 232, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980). There the plaintiffs who represented a class of persons who used real estate brokers in the purchase and sale of homes in the Greater New Orleans area brought suit against various real estate trade associations, firms and realtors for allegedly price fixing brokerage commissions. The complaint contained the following allegations concerning interstate commerce:

> (1) that the activities of the respondents are "within the flow of interstate commerce and have an effect upon that commerce";

---

11. Given the disposition on this issue, I need not decide defendants' other contention that the plaintiffs may not rely upon a violation of a statutory right as a basis for a claim under § 1985.

(2) that the services of respondents were employed in connection with the purchase and sale of real estate by "persons moving into and out of the Greater New Orleans area";

(3) that respondents "assist their clients in securing financing and insurance involved with the purchase of real estate in the Greater New Orleans area," which "financing and insurance are obtained from sources outside the State of Louisiana and move in interstate commerce into the State of Louisiana through the activities of the [respondents]"; and

(4) that respondents have engaged in an unlawful restraint of "interstate trade and commerce in the offering for sale and sale of real estate brokering services."

*Id.* at 235–36, 100 S.Ct. at 506. Recognizing the broad authority given Congress under the Commerce Clause, the Court held that jurisdiction under the Sherman Act is satisfactorily pled if plaintiffs allege that the defendants' activities are either in interstate commerce or affect some appreciable activity in it. These allegations were found to be adequate.

 Various circuit courts in construing *McLain* have disagreed over whether a plaintiff must plead that a defendant's *unlawful* activities are those that must be in or affect interstate commerce. For example, the Ninth Circuit has determined "that a party need only show that a defendant's general business, as opposed to the alleged illegal conduct, affected interstate commerce...." *Rowin v. State Bar of Arizona,* 686 F.2d 692, 699 n. 7 (9th Cir.1981). The Tenth Circuit, however, is of the opinion that a plaintiff must plead "a logical connection ... between the unlawful conduct and interstate commerce." *Crane v. Intermountain Health Care, Inc.,* 637 F.2d 715, 723 (10th Cir.1981) (en banc). The Third Circuit has yet to address this issue. I note that my colleague Judge Pollak has resolved this conflict in favor of the latter view. *See Pao v. Holy Redeemer Hosp.,* 547 F.Supp. 484 (E.D.Pa.1982). In any event, I need not decide the issue as I find that SA

has met the more restrictive of the two approaches by pleading that the defendants' alleged unlawful activities have the requisite effect on interstate commerce.

In their amended complaint, SA asserts that SA "derives annual revenue from operations conducted in interstate commerce in an amount in excess of $50,000.00, and during its most recent fiscal year derived revenues from construction contracts performed without the Commonwealth of Pennsylvania in excess of One Million Dollars ($1,000,-000.00)." Amended Complaint ¶ 5. The amended complaint continues by stating that:

substantial quantities of concrete, steel, lumber, piping, roofing, stone, brick, glass, tubing, tile, linoleum and other material used in construction have been sold and shipped to Plaintiff SA and other open shop contractors in the construction industry of the Greater Philadelphia area from suppliers in various states, including states other than Pennsylvania. Plaintiff SA is engaged in interstate commerce, Plaintiff SA's employees are employed in interstate commerce, and the construction industry in the Greater Philadelphia area constitutes interstate commerce.

Amended Complaint ¶ 6. Paragraph 47 contends that the defendants' alleged unlawful combinations and conspiracies include an effort to force out-of-state suppliers and users to refuse to do business with SA and other open shop contractors. Again in paragraph 51, SA alleges that the defendants' supposed unlawful agreements have caused SA to be "deprived of access to concrete, steel, and other construction materials which are shipped into the Greater Philadelphia area from suppliers in Pennsylvania and other states. *See also* Amended Complaint ¶ 55(d).

These allegations sufficiently allege that the defendants have combined and conspired in a way so as to affect an "appreciable activity demonstrably in interstate commerce." *McLain,* 444 U.S. at 242, 100 S.Ct. at 509. As a result I find that the amended complaint invokes jurisdiction under the Sherman Act.

Defendants next argue that SA's complaint fails to plead causes of action which evade the exemptions generally given organized labor from the proscriptions of the antitrust laws. At this stage of the proceedings, I must conclude that defendants' position is incorrect.

The concerted actions of organized labor enjoy two forms of immunity from the Sherman Act. The first, the statutory exemption, is embodied in several statutes. Its formation began in 1914 with the passage of sections 6 and 20 of the Clayton Act. Section 6 provides:

> The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17 (1976). Section 20 continues:

> No restraining order or injunction shall be granted by any court of the United States, or a judge or the judges thereof, in any case between an employer and employees, or between employers and employees, or between persons employed and persons seeking employment, involving, or growing out of, a dispute concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property, or to a property right, of the party making the application, for which injury there is no adequate remedy at law, and such property or property right must be described with particularity in the application, which must be in writing and sworn to by the applicant or by his agent or attorney.
>
> And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States.

29 U.S.C. § 52 (1976). Although these statutes were seemingly very broad, the Supreme Court severely limited their application in *Duplex Printing Press Co. v. Deering,* 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921).

Congress responded in 1932 with the passage of the Norris-LaGuardia Act, 29 U.S.C. §§ 101–15. Several sections are relevant to immunity. First, it expanded the actions covered by the statutory immunity:

> The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee.

29 U.S.C. § 113(c) (1976). By this statute, then, secondary boycotts and picketing were generally protected from antitrust at-

tack. *Connell Construc. Co. v. Plumbers and Steamfitters Local Union No. 100,* 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). Next the Act delineated several acts which could not be subjected to a federal court injunction:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:

(a) Ceasing or refusing to perform any work or to remain in any relation or employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any such undertaking or promise as is described in section 103 of this title;

(c) Paying or giving to, or withholding from, any person participating or interested in such labor dispute, any strike or unemployment benefits or insurance, or other moneys or things of value;

(d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;

(e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;

(f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, re-

gardless of any such undertaking or promise as is described in section 103 of this title.

29 U.S.C. § 104 (1976). Lastly, the Act provided:

No court of the United States shall have jurisdiction to issue a restraining order or temporary or permanent injunction upon the ground that any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated in section 104 of this title.

29 U.S.C. § 105 (1976).

■ Thus the statutory immunity now enjoyed by union activity is expansive. It is not, however, without limitations. For example, it only applies to actions unilaterally taken by unions in pursuit of their own interests. *See* 16E Von Kalinowski, *Business Organizations, Antitrust Laws and Trade Regulation* § 48.01, at 48–1 (1982). Thus once a union enters into an agreement with a nonlabor group, this exemption is lost. *Id.* § 48.03[1], at 48–27. Whether violent conduct also takes such unilateral activity out of this exemption is discussed below.

■ A second exemption, denominated as the nonstatutory exemption, arose from the recognition that certain agreements between organized labor and nonlabor entities although not immune by statute, nonetheless deserve a limited immunity in order to harmonize the two congressional policies contained in the antitrust laws which favor free competition on the one hand and the labor laws which encourage collective bargaining on the other. *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.,* 690 F.2d 489, 530 (5th Cir.1982). Some guidelines are identifiable. Agreements which serve legitimate union goals such as wages, hours and other employment conditions as long as they are reached in a lawful manner invoke this exemption. Von Kalinowski, *supra,* § 48.03[1], at 48–31 to 48–32. The scope of this exemption is far from clear and the Supreme Court's decision in *Connell*

*Construction Co. v. Plumbers and Steamfitters Local Union No. 100, supra,* has not dispelled the cloud.

A discussion of whether SA's amended complaint successfully leaps the immunity hurdle follows. In deciding, I must keep in mind that the Supreme Court has mandated that all such immunities be narrowly construed. *See Group Life & Health Insur. Co. v. Royal Drug,* 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979).

Count three of the amended complaint alleges that the defendants along with co-conspirators consisting of union contractors, material suppliers and construction users have engaged in unlawful combinations and conspiracies to unreasonably restrain interstate trade and commerce and attempted to monopolize the construction industry in the Greater Philadelphia area. Amended Complaint ¶¶ 45–46. The results in part, SA continues, have been to reduce free competition among contractors by eliminating open shop contractors such as SA, to reduce price competition in the construction industry and to create a monopoly of closed shop contractors. *Id.* ¶¶ 47–49 & 53. SA further alleges that there is no bona fide labor dispute between SA and the defendants and that the defendants have no desire to organize the employees of SA and other open shop contractors or to negotiate with them concerning wages, hours or other conditions of employment. *Id.* ¶ 50. For purposes of defendants' motion, all of these allegations must be taken as true.

Because count three alleges combinations and conspiracies with nonlabor entities, the statutory immunity offers the defendants no protection. *See H.A. Artists & Assoc. v. Actors' Equity Ass'n.,* 451 U.S. 704, 101 S.Ct. 2102, 68 L.Ed.2d 558 (1981); *UMW v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *United States v. Hutcheson,* 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); *Consol. Exp., Inc. v. N.Y. Shipping Ass'n.,* 602 F.2d 494, 511 (3d Cir. 1979), *vacated on other grounds,* 448 U.S. 902 (1980). Thus for defendants to prevail in their motion, it must be clear that SA fails to plead allegations which overcome the nonstatutory exemption.

The seminal cases involving this exemption concerned parties who had collective bargaining relationships. In *Allen Bradley Co. v. Local No. 3, IBEW,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), a local union of electrical workers used strikes and boycotts to force area manufacturers to sell only to contractors with closed shop agreements with the local and to prevent contractors from buying materials from manufacturers who likewise did not have closed shop arrangements with the local. Despite the fact that the local acted out of concern for the terms and conditions of its members, the Court found that the local went beyond that which was permissible. The Court concluded that Congress did not intend unions to be free to aid and abet manufacturers and traders in violating the Sherman Act even when it had its own self-interest in mind.

The Court next addressed the nonstatutory exemption in *UMW v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). There a union entered into a contract with a multi-employer unit of coal producers to impose the agreed upon wage scale on all other coal producers with which the union had a collective bargaining relationship. Six Justices found the exemption did not shield the union from antitrust exposure. Justice White, joined by two others, delivered the opinion of the Court:

> [W]e think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units. One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy.

*Id.* at 665–66, 85 S.Ct. at 1591. The opinion left unclear, however, whether a predatory intent on the part of the union and the large employers to drive out the smaller coal producers was a necessary element. *See* Gorman, *Labor Law,* Chp. 27, § 3, at 630 (1976). The concurrence in *Pennington,* however, believed that for an agreement to

lose its nonstatutory immunity, there must be a finding that the parties intended to drive the smaller competitors out of business. Because of this split, this decision is generally read as requiring predatory intent. *See* Gorman, *supra; Consol. Exp., Inc. v. N.Y. Shipping Ass'n,* 602 F.2d at 515–16.

That same term, the Court rendered its decision in *Local 189 Meat Cutters v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Again the Court split into three camps. Justice White joined by two other Justices announced the judgment of the Court and stated that where a union agrees with an employer to restrain a product market, whether that agreement merits exemption from the antitrust laws depends on whether the restraint:

> is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy. . . .

*Id.* at 689–90, 85 S.Ct. at 1602 (footnote omitted). Justice Goldberg with two others said in a concurrence that "collective bargaining activity concerning mandatory subjects of bargaining under the Labor Act is not subject to the antitrust laws." *Id.* at 710, 85 S.Ct. at 1614. This case has been construed as not requiring any predatory intent. *Consol. Exp., Inc. v. N.Y. Shipping Ass'n.,* 602 F.2d at 516; L. Sullivan, *Antitrust,* Chp. 9, § 237, at 727 (1977).

A more recent Supreme Court case involving the nonstatutory exemption is *Connell Construction Co. v. Plumbers and Steamfitters Local 100,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). This was the first time the Court was faced with the possible application of the exemption where there was no collective bargaining relationship between the parties. There the union for a construction subcontractor had forced a number of general contractors with whom they had no collective bargaining agreements to agree to only use subcontractors with current collective bargaining contracts with the union. The Court for the first time used the term nonstatutory exemption and stated the rationale for its application:

> The Court has recognized, however, that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from the antitrust sanctions.

*Id.* at 622, 95 S.Ct. at 1835. The Court then turned to the facts before them. Adopting reasoning akin to that in *Jewel Tea,* the Court recognized that although the union's goal—to organize as many subcontractors as possible—was legal, the Court believed the methods employed by the union went beyond permissible bounds:

> Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally . . ., the nonstatutory exemption offers no similar protection when a union and a nonlabor party agree to restrain competition in a business market.
>
> \* \* \* \* \* \*
>
> Here Local 100, by agreement with several contractors, made nonunion subcontractors ineligible to compete for a portion of the available work. This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

421 U.S. at 622–23 & 625, 95 S.Ct. at 1835–36. *See Consol. Exp., Inc. v. N.Y. Shipping,* 602 F.2d at 517.

■ *Connell, Jewel Tea* and *Pennington* have generated much comment over the breadth and requirements of the nonstatutory exemption. *See generally,* Von Kalinowski, *supra,* § 48.03; Gorman, *supra,* Chp. 27, §§ 3–4; Sullivan, *supra,* Chp. 9, § 237; M. Handler & W. Zifchak, *Collective Bargaining and the Antitrust Laws: The Emasculation of the Labor Exemption,* 81 Col.L.Rev. 459 (1981). It is fairly evident, however, that agreements outside the collective bargaining process are more suspect and less likely to merit exemption:

> We understand *Connell* to hold, then, that an agreement between a union and a business organization, outside a collective bargaining relationship, which imposes a direct restraint upon a business market, and which is not justified by congressional labor policy because it has actual or potential anticompetitive effects that would not flow naturally from the elimination of competition over wages and working conditions, is not exempt from antitrust scrutiny.

*Larry v. Muko, Inc. v. Southwestern Pennsylvania,* 609 F.2d 1368, 1373 (3d Cir.1979) (en banc). *See Consol. Exp., Inc. v. N.Y. Shipping Ass'n,* 602 F.2d at 517–18 (exemption available only where market restraint advances a legitimate labor goal and agreement restrains trade no more than necessary).

Recently the Supreme Court again discussed the interrelationship of the labor and antitrust statutes. In *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), the Court restated its reasoning in *Connell:*

> The Court ... addressed the § 8(e)[12] issue on the merits and found that § 8(e) did not allow the agreement at issue.... As a result, the agreement was subject to

the antitrust laws, for the majority was persuaded that the legislative history did not suggest "labor-law-remedies for § 8(e) violations were intended to be exclusive, or that Congress thought allowing antitrust remedies in cases like the present one would be inconsistent with the remedial scheme of the NLRA"....

> In Connell, we decided the § 8(e) issue in the first instance. It was necessary to do so to determine whether the agreement was immune from the antitrust laws.

*Id.* at 85, 102 S.Ct. at 860 (citations omitted). Thus it appears that the immunity is lost at least where a § 8(e) violation is alleged.

■ In count three SA has set forth allegations that the defendants have combined and conspired with nonlabor entities to restrain interstate commerce and to monopolize the construction industry outside of a collective bargaining process. Moreover, from the face of the amended complaint there appears to be no labor policy to otherwise justify the alleged agreements.[13] Furthermore, they allege facts which indicate the defendants entered into agreements with others which are conceivably violative of § 8(e). Whether plaintiffs can ultimately prove this at trial remains to be seen. It is clear, however, that their allegations are sufficient to avoid the nonstatutory immunity accorded organized labor under different circumstances.[14]

Next defendants move for the dismissal of count four. In this count, SA alleges that the defendants conspired and combined among themselves to violate sections one and two of the Sherman Act by undertaking actions, at times violent, to protect un-

---

**12.** Section 8(e), which proscribes "hot cargo" agreements, is contained in 29 U.S.C. § 158(e) (1976).

**13.** Defendants repeatedly assert that their conduct consists of a lawful primary boycott and involves legitimate standards picketing. This may in fact be true. However, for purposes of this motion, I may only look to the facts as alleged by SA. SA asserts that defendants' conduct constitutes an unlawful secondary

boycott as well as a violation of the Sherman Act.

**14.** Defendants' reliance on *Sâmoff v. Buildings & Const. Trade Council of Phila. & V.,* 475 F.2d 203 (3d Cir.), *vacated on other grounds,* 414 U.S. 808, 94 S.Ct. 151, 38 L.Ed.2d 44 (1973) is misplaced. That case did not involve application of the nonstatutory exemption.

ion contractors from competition from open shop contractors such as SA.[15] Defendants assert that this count is barred by the statutory exemption. The law with respect to this issue is not without divergent opinions.

One approach supports plaintiffs' claim. Plaintiffs point out that the various statutes which give rise to the statutory exemption forbid federal court intervention where a union undertakes peaceful, lawful actions. Plaintiffs' argument is that once unions engage in violent activity the exemption is lost and the unions become exposed to treble damage liability. One reading of *United States v. Hutcheson, supra,* which first identified the statutory exemption lends some substance to this view. The Court there allowed the defendants an exemption from the antitrust laws because the union had used "conventional peaceful activities. . . ." 312 U.S. at 227, 61 S.Ct. at 464. *See* M. Handler & W. Zifochak, *supra,* at 475–77 & 481. This approach was adopted by the court in *Altemose Const. Co. v. Atlantic, Cape May, etc.,* 493 F.Supp. 1181 (D.N.J.1980):

> The Clayton and Norris-LaGuardia Acts provide no immunity for the acts alleged in this action. Section 4 of the Clayton Act merely states that labor organizations may lawfully carry out their legitimate objects. Section 20 of the Clayton Act exempts peaceful labor activity including communication aimed at persuading individuals to cease working for or patronizing particular employers. Plaintiff's allegations are replete with acts and threats of violence that were made to prevent Altemose from obtaining necessary supplies for the construction. Although it was in the interest of the union defendants to seek to remove the nonunion contractor from the job, or to ensure that the terms under which its employees worked met area standards of

union members, the objective was not pursued by use of peaceful authorized methods.

*Id.* at 1191 (footnote omitted).

However a different result is suggested by the legislative history of § 8(b)(4), the statute which proscribes certain secondary activity and forms the basis of count one of plaintiffs' amended complaint. This history was reviewed by the court in *C & K Coal Co. v. UMW,* 537 F.Supp. 480 (W.D.Pa. 1982), *aff'd in part and rev'd in part,* 704 F.2d 691 (3d Cir.1983). It was the conclusion of that court that by passing the LMRA in 1947 Congress intended to preempt recovery under the Sherman Act for unilateral union activities which are violative of § 8(b)(4).

The court outlined the changes in the bill that ultimately was enacted as § 8(b)(4). The first House version explicitly subjected unions to the antitrust laws including the treble damage provision. In the Senate, certain members also agreed. Senator Taft among others, however, believed that this was too harsh a sanction and suggested as a compromise that injured parties be permitted to recover actual damages. Remarks made during Senate debate made clear that this right under the labor laws was in lieu of any under the Sherman and Clayton Acts. *Id.* at 502. *See* 2 NLRB, Legislative History of the Labor Management Relations Act, 1947, at 1370–71, 1398 (1948). Senator Taft's position ultimately prevailed.[16] Relying in part on this legislative history, the district court in *C & K Coal Co. v. UMW, supra,* entered judgment in favor of the unions.

In affirming the district court's action in this regard, the Court of Appeals relied solely on the ground that there had been no agreements between any of the plaintiff

---

**15.** Plaintiffs do not allege, however, that they were forced into an agreement with the defendants violative of § 8(e).

**16.** The damage provision is contained in § 303, 29 U.S.C. § 187 (1976). *See* note 5, *supra.* Section 8(b)(4) was amended again in 1959. At the same time § 303 was also amended to al-

low recovery for damages from any of the proscribed activity added to § 8(b)(4). M. Handler & W. Zifchak, *supra,* at 473–75. Nothing in these amendments changes the conclusion that Congress did not intend to allow treble damage recovery under the antitrust laws for § 8(b)(4) violations caused by unilateral union activity.

nonunion companies and the defendant unions to stop shipments because of coercive tactics by the unions. Thus, the court found there was no combination in restraint of trade.[17] The court concluded that "[a]bsent agreement, there is no concert of action with a non-labor party and thus no possibility of antitrust liability." *C & K Coal, supra,* slip op. at 699. The court noted that it had reservations about the district court's conclusion that § 8(b)(4) preempted the Sherman Act "when there is an agreement between a labor organization and a non-labor party." *Id.* The court made no statement on the issue of preemption where an antitrust claim is based on a conspiracy among labor entities alone. The court does not clearly state whether their affirmance is based on preemption because no nonlabor entity was involved or a failure to find concerted activity as required by § 1 of the Sherman Act. However, I find nothing in the Third Circuit's opinion to undermine the district court's conclusion concerning preemption where antitrust liability is premised on unilateral actions allegedly taken by union entities alone.

This view is implicit in dicta contained in *Connell. Connell* involved an asserted violation of § 8(e). Unlike § 8(b)(4), there is no provision in the labor law for a party injured by a § 8(e) agreement to recover damages. The Court said:

> Local 100 contends that even if the subcontracting agreement is not sanctioned by the construction-industry proviso and therefore is illegal under § 8(e), it cannot be the basis for antitrust liability because the remedies in the NLRA are exclusive. This argument is grounded in the legislative history of the 1947 Taft-Hartley amendments. Congress rejected attempts to regulate secondary activities by repealing the antitrust exemptions in the Clayton and Norris-LaGuardia Acts, and created special remedies under the labor law instead. It made secondary activities unfair labor practices under § 8(b)(4),

and drafted special provisions for preliminary injunctions at the suit of the NLRB and for recovery of actual damages in the district courts, § 10(1), of the NLRA, 49 Stat. 453, as added 61 Stat. 149, as amended, 29 USC §§ 160(I), 187. But whatever significance this legislative choice has for antitrust suits based on those secondary activities prohibited by § 8(b)(4), it has no relevance to the question whether Congress meant to preclude antitrust suits based on the "hot-cargo" agreements that it outlawed in 1959. There is no legislative history in the 1959 Congress suggesting that labor-law remedies for § 8(e) violations were intended to be exclusive, or that Congress thought allowing antitrust remedies in cases like the present one would be inconsistent with the remedial scheme of the NLRA.

421 U.S. at 633–34, 95 S.Ct. at 1840–41 (footnotes omitted). *See Allied Intern. v. Intern Longshoremen's,* 640 F.2d 1368, 1381 (1st Cir.1981), *aff'd,* 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982); *Mead v. Retail Clerks Int. Ass'n,* 523 F.2d at 1376.

I find the latter view persuasive. Any contrary conclusion based on the *Hutcheson* case ignores the subsequent enactment and legislative history of § 8(b)(4). Nor can I subscribe to the view expressed by the court in *Altemose Const. Co. v. Atlantic, Cape May, etc., supra,* that allegations of violence overcome the statutory exemption. In light of the legislative history outlined above, I can only conclude that where unions engage in violent actions, the statutes giving rise to this exemption only permit me to enjoin these actions and then only where I follow the detailed procedures contained in 29 U.S.C. § 107.[18] I do not believe the law permits me to go the next step, as SA urges, and award them treble damages under the antitrust laws. Violent conduct does not transform an unlawful secondary boycott into an antitrust conspiracy.

---

**17.** Unlike here, no relief was sought under § 2 of the Sherman Act.

**18.** Of course SA can still seek punitive damages in their state action counts. *See* discussion at 10–12, *supra.*

■ However, my conclusion that the remedies under the labor laws for § 8(b)(4) violations bar recovery under the antitrust statutes for unilateral union activities which violate § 8(b)(4) does not compel me to dismiss count four at this time. Before SA is prevented from pursuing an antitrust remedy against the defendants, it first must be ascertained that the controversy between them is a labor dispute which invokes these labor law remedies. To the contrary, SA has affirmatively alleged in count four that there is no such labor dispute. Amended Complaint §§ 50(a) & 53.

A similar situation was presented to the court in *Sacramento Coca-Cola Bottling Co., Inc. v. Chauffeurs, Teamsters, etc.,* 440 F.2d 1096 (9th Cir.), *cert. denied,* 404 U.S. 826, 92 S.Ct. 57, 30 L.Ed.2d 54 (1971). The plaintiffs, who were sellers of soft drinks and in one instance also a bottler, sued various unions because they supposedly forced state fair officials to forbid the sale of Coca-Cola at the fair. As here, they alleged violations of § 303(b) of the LMRA, the antitrust laws as well as various state law claims. In reviewing the trial court's refusal to dismiss plaintiff's antitrust count, the court stated:

> Under 15 U.S.C. § 17, the labor unions, which are engaged in a "labor dispute" are, normally, exempted from antitrust liability. However, the plaintiffs in the present case have affirmatively alleged in their complaint that no such labor dispute exists. This allegation is sufficient to withstand a motion to dismiss.

*Id.* at 1098, *citing I.P.C. Distributors, Inc. v. Chicago Moving Picture Machine Operators Union,* 132 F.Supp. 294 (N.D.Ill.1955). *Cf. Big Apple Supermarkets, Inc. v. Dutto,* 237 F.Supp. 774, 777 (S.D.N.Y.1965). SA similarly alleges in count four, by reference, that "[t]here is no bona fide labor dispute" between SA and the defendants. Amended Complaint ¶ 50(a) & 53.

SA's allegation, which must be accepted as true, is plainly inconsistent with count one in which SA seeks to invoke the remedies provided by the labor laws for labor disputes involving § 8(b)(4) violations.

However, Rule 8(e) of the Federal Rules of Civil Procedure permits the pleading of inconsistent claims. SA will not be able to recover under both counts one and four. As the record develops, I will be able to discern whether this case is appropriately one subject to these labor law remedies. If so, I will dismiss count four at that time. To do so now would be premature.

COUNTS FIVE THROUGH TEN

Next the defendants move to dismiss all the state law counts as to the individual and labor union defendants. I agree that counts six through eight brought by the individual plaintiffs must be dismissed as to these defendants although for reasons different from those asserted by the defendants. Moreover, I also find that these three counts must be dismissed as to the Council because there is no subject matter jurisdiction for this court to entertain them.

In plaintiffs' amended complaint, only the first four counts allege federal causes of action which properly invoke this court's jurisdiction. The remaining six counts are said to be pendent to the federal ones. Of the federal counts only count two was asserted by the individual plaintiffs. The remaining three federal counts are brought only by SA. As set forth above, I have concluded that count two must be dismissed. The individual plaintiffs only remaining counts then, counts six through eight, are based solely on state law.[19]

■ Pendent jurisdiction permits a federal court to resolve state law claims where there is a "common nucleus of operative fact" between the state law claims and a federal claim also before the court. *UMW v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Implicit in this doctrine is that the same parties are involved in both the federal and state claims. *Jones v. City of Houma,* 339 F.Supp. 473 (E.D.La.1972); *Walsh v. Butcher & Sherrerd,* 395 F.Supp. 597 (E.D.Pa.1975); *Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 250 F.Supp. 926 (E.D.Pa.1966). *See Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).

**19.** SA is not a party to these counts.

Here the individual plaintiffs have failed to successfully assert a valid federal cause of action. Thus they have no federal claim to which they can append their state law claims. The fact that their co-plaintiff, SA, has validly asserted federal claims is of no help to them. *Trio Processing Corp. v. L. Goldstein's Sons, Inc., supra.* The individual plaintiffs and SA were permitted to join in one lawsuit by virtue of Fed.R.Civ.P. 20(a). Rule 82 of the Federal Rules of Civil Procedure makes clear, however, that although rule 20(a) permits them to join in one lawsuit, it does not confer jurisdiction to hear all of their claims.[20] Each plaintiff still has the burden of invoking the subject matter jurisdiction of this court for each's claims. *Cf. Zahn v. Intern. Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973) (each plaintiff must satisfy requisite jurisdictional amount in order to invoke diversity jurisdiction). As a result, I have no jurisdiction to hear counts six through eight. Accordingly, they will be dismissed.

Defendants also contend that counts nine and ten asserted by SA should be dismissed as against the union and individual defendants and that count five should likewise be dismissed as against the union defendants[21] because the plaintiffs have failed to state federal causes of action against them in counts one through four. Because I have found that counts three and four allege tenable causes of action against all of the defendants and count one avers one against the union defendants,[22] this argument must fail.

Lastly, defendants assert once again that SA failed to allege causes of action against the union defendants in counts five, nine and ten because there are no factual averments of actual participation or authorization or ratification of individuals' actions by the union so as to hold them culpable. This argument was considered and rejected by me in connection with count one. I reject it once more.

---

**20.** Rule 82 states: "These rules shall not be construed to extend or limit the jurisdiction of the United States district courts...."

**21.** Plaintiffs do not assert a cause of action against the individual defendants in count five.

**22.** Plaintiffs do not seek recovery from the individual defendants in count one.